### MARCH TERM, 1881.

---

### HECHT *v.* BOUGHTON.

EJECTMENT.—In ejectment, it is a uniform principle that if both parties claim title from the same source, it is treated, for all the purposes of the case, as if the title resided in that source, each party is estopped from denying it, and so far as respects that source the controversy is reduced to the inquiry: which party, plaintiff or defendant, if either, has title from that source.

TAX PROCEEDINGS.—Tax proceedings being *in invitum*, are to be strictly construed, and whatever is essential to their validity must be affirmatively shown by the party who claims under them.

IDEM.—Constitutional law forbids the levying of a tax before the owner of property has had an opportunity to object to the assessment.

ERROR to the District Court of Laramie County.

The facts are stated in the opinion delivered in the district court, by Peck, J.

*C. N. Potter E. W. Mann* and *W. W. Corlett*, for plaintiff in error.

After the plaintiff's counsel had announced their case as closed, the court suggested an absence of certain proof, and allowed them to proceed with further testimony in their opening, under the objection of defendant. This may be a right within the discretion of the court, and it may be argued that no matter within the discretion of the court

will be reviewed by an appellate court. While such was probably the old doctrine, it is surely exploded now, and appellate courts are continually giving their attention to such matters. Powell on Appellate Proceedings, pages 195–199.

The petition alleges ownership in fee, and for that reason a right to possession. It is true that in ejectment a plaintiff may recover by showing a conveyance from one having had prior adverse possession, with no abandonment thereof, by grantor or grantee, but why? because from that fact the courts will *presume title*, and hold that such evidence establishes a *prima facie* case, on account of that presumption—but the possession to warrant a presumption of title must be an *adverse* possession. Hilliard on Rem. for Torts., sec. 56, p. 171; Hilliard on Rem. for Torts., sec. 65, p. 175; *Murphy* v. *Wallingford*, 6 Cal., 648.

The law presumes, till the contrary be shown, that a man in possession without title intends to hold for the true owner. Tyler on Ej., 859; *Harvey* v. *Tyler*, 2 Wall., 328; *Morrison* v. *Hays*, 19 Ga., 294.

A person in the full possession of all his faculties, and able to read, is *bound* to know and understand the contents of an instrument executed by him or in his possession as a party to it. Such a person cannot say that he did not read the instrument. Bigelow on Fraud, 73 to 82; *Bacon* v. *Markley*, 46 Ind., 116; *Hawkins* v. *Hawkins*, 50 Cal., 558.

*J. W. Fisher* and *T. D. W. Yonley*, for defendant in error.

It rests in the discretion of the court to allow evidence to be introduced after the testimony has been closed. *Moon* v. *Starbuck*, 4 Cal., 274; *Russell* v. *Kerney*, 27 Geo., 96; *Wills* v. *Walker*, 29 Geo., 450; *Fall* v. *Cathcart*, 8 Ala., 725; *Priest* v. *Union Canal Co.*, 4 Cal., 170.

The delivery of the deed to Mrs. Boughton is not only established by her oath, but is presumptively shown by the fact that the deed is of record. *Kille* v. *Ege*, 79 Pa. St., 15;

*Cecil* v. *Beaver*, 28 Iowa, 241; *Kerr* v. *Bernie*, 25 Ark., 225; *Jackson* v. *Cleavland*, 15 Mich., 94; *Bulitt* v. *Taylor*, 34 Miss., 708; *Billings* v. *Stark*, 15 Fla., 279; *Reed* v. *Douthet*, 62 Ills., 348; *Tuttle* v. *Turner*, 28 Tex., 759; *Benson* v. *Woodverton*, 2 McCarter, N. J., 158.

The true consideration of a deed may be shown in certain cases, even against the recitals of the deed, but it can never be shown that there was no consideration for the deed for the purpose of defeating the deed entirely. *Wilt* v. *Franklin*, 1 Bin. (Pa.,) 502; *Farrington* v. *Barr*, 36 N. H., 89; *Hurn* v. *Soper*, 6 Harr. & Johns, (Md.,) 276; *Betts* v. *Union Bank*, 1 Harr. & Gill., 175; *Clagett* v. *Hall*, 9 Gill. & Johns. (Md.,) 91; *Cole* v. *Alders*, 1 Gil. (Md.,) 423; *Elysville Man. Co.* v. *Okisko Co.*, 1 Maryland Ch. Decis., 392; *Henderson* v. *Henderson*, 13 Mo., 152; *Fellows* v. *Wise*, 49 Mo., 350; and see to the same effect, *Spec* v. *Gregg*; *Myric* v. *Wells*, 52 Miss., 149.

Mere difference of opinion between the courts ought not, for obvious reasons, to be deemed sufficient to reverse a judgment. *Ide* v. *Churchill*, 14 Ohio St., 377; *Eastman* v. *Wright*, 4 Ohio St., 156; Powell on Appellate Jurisdiction, p. 229.

And the rule is the same when the facts are found by the court sitting as a jury. *Moss* v. *Atkinson*, 44 Cal., 16; *Gale* v. *Water Company*, 44 Cal., 46; *Smith* v. *Athern*, 34 Cal., 509.

But the defendant relied upon a title acquired by him through a purchase at tax sale, and the burden was upon him to show a compliance at every step with the requirements of the statutes. There is nothing in the statutes of Wyoming making the tax deed for any purpose evidence of the facts therein recited; and without a statute for that purpose, the recitals could not have that effect. Burroughs on Taxation, p. 333.

The plaintiff not only failed to show a technical compliance with the statute in the tax proceedings under which he claims title, but, on the contrary, it appears affirmatively

that the law was not complied with. *Corporation of Wash-ington* v. *Pratt*, 8 Wheat., 687 ; *French* v. *Edwards*, 13 Wall., 506 ; *Ainsworth* v. *Dean*, 1 Foster (N. H.,) 400 ; *Llead's Executors* v. *Course*, 4 Cranch,, 403 ; *Dyer* v. *Boswell*, 39 Md., 465.

PECK, J.　This is an action of ejectment for lots one (1) and two (2) in block three hundred and fifty-three (353), located in the city of Cheyenne, and mesne profits, brought in the first district court by Mary E. Boughton, the plaintiff below, against Charles Hecht, the defendant below. The defense was made by the plea of the general issue ; the case was tried by the court without a jury, and judgment rendered for the plaintiff below for the possession and for mesne profits.　After argument and careful consideration, we concur in the rulings below upon the admission and exclusion of testimony ; and for the reasons stated in the opinion of that court which is embraced in our record, and is adopted as our opinion ; we concur in its ruling on the motion for a non-suit, and in its conclusions of fact and law, and in its judgment rendered thereon. As no error has been well assigned, that judgment must be affirmed, and with costs.

Opinion delivered in the District Court by PECK, J.

I was entirely satisfied, on the conclusion of the evidence, as to the judgment that should be rendered.　The case was well argued ; but the argument did not change my mind. In view however, of the voluminousness of the testimony, I deemed it prudent to wait and examine the stenographer's transcript ; it has since been made.　I have examined it, and have found no reason for altering my view ; I therefore proceed to deliver an opinion in accordance with my original conviction.

This is an action of ejectment for lots one and two in block three hundred and fifty-three in the city of Cheyenne, and for mesne profits.　The plea is the general issue.

The plaintiff's evidence tends to show, and, unimpeached, does show, that Martin V. Boughton occupied the premises in question continuously in his own right for several years prior and down to the execution by him to her of a deed in fee of the premises, dated February 16, 1871; that she then took, and continued in possession under the deed and in her own right, first through her grantor, and next through one Smith, until she was ousted by the defendant in April, 1877; and that the United States by a patent dated April 17th, and recorded in the county clerk's office of the county of Laramie, on the 19th of May, 1874, conveyed the same premises at the date of the deed to the Union Pacific Railroad Company. Upon this state of the evidence the defendant claims that the plaintiff has shown title out of her grantor, and out of herself, as his successor in interest, and therefore that she has nothing to recover upon. Now, allowing that the proof of the patent does show title out of her grantor, and so far as she relies upon his title, out of herself, the proof of the patent only cuts down her title to the date of the patent, leaving her to stand upon an adverse title in herself by possession, which has been continuous from that date to the ouster. This gives to her title enough to recover upon, unless the defendant has shown a better; it cuts off his claim of superior title under the sheriff's deed to him of April 21, 1877, on a sale under an execution against Martin V. Boughton, which sale was made of the premises as belonging to the latter; and it cuts off the defendant's claim of superior title under the tax-deed from the county treasurer, executed to him on the 30th day of December 1878, upon a sale of the premises upon a delinquent tax assessed and levied against M. V. Boughton, as the owner of the premises,—it cuts off the tax title, provided that the tax can bind the premises only as belonging to M. V. Boughton when they were assessed and the tax laid upon them, or during the conduct of the tax proceeding, and as otherwise duly laid and enforced: for these two alleged titles, the one by execution, the other by tax, are the defendant's entire

grounds of claim; and unless the tax title can hold, as binding the land, though not belonging to M. V. Boughton during the tax proceedings, and as otherwise duly laid and enforced upon it, insomuch as he is the defendant's only source of title, the effect of the patent in cutting off the Martin V. Boughton title, and with it the defendant's lease, as the controlling title, that which the plaintiff acquired by an adverse possession subsequent to the patent.

It does not, however, follow that the effect of proving the patent is to cut the Boughton title off, down to the date of the patent. Under section 485 of the Union Pacific land grant the United States conveyed to the company the equitable title to the lands, specified in those sections, to be confirmed upon the accomplishment of given conditions, which are also therein specified by a patent from the United States conveying the legal estate in fee. The execution of the patent is conclusive that the conditions were satisfied, and that at its execution the company had acquired as against the government, a full equitable title. The Boughton title was founded on an adversory possession, which if uninterrupted, would have ultimately overcome and extinguished the title of the company.

But it is an uniform principle of ejectment that if both parties claim title from the same source, it is treated for all the purposes of the case that title resided in that source; each party is estopped from denying it; and so far as respects that source, the controversy is reduced to the inquiry, which party, plaintiff or defendant, if either, has got title from that source. That is the next question in this case,

Before passing to that question, it is proper to notice another position of the defense,—namely—that the plaintiff could not declare upon a seisin-in-fee, as she has done, and seek to recover upon an incomplete possessory title, as she does seek to recover. But such a seisin is founded equally upon possession as upon grant, and is proved as well by the former as by the latter: though inchoate, because the possession has not reached the full period, it is still a seisin

and· is as effectual against a stranger, as if matured by possession. The petition alleges in terms a seisin-in-fee in the plaintiff and a corresponding right of possession, without alleging how the seisin arose; she was therefore at liberty to prove it by whatever sufficed for the purpose; and under the issue the defendant cannot have been surprised by the proof that she introduced. The petition is more precise and technical, as a petition suitable to setting forth her title, than section 557 of the Civil Code requires.

The defense claims that the Martin V. Boughton deed was executed to his wife, whose name is Mary Boughton, for a valuable consideration paid to him by her; that she was intended by the name, "Mary E. Boughton," contained in the deed as the name of the grantee, the initial "E." having been inserted by mistake, and that the Martin V. Boughton interest was not conveyed to the plaintiff, because she is a stranger to the deed; nor to Mary Boughton, because she was the grantor's wife, and the execution of the deed was thus inoperative, leaving the interest in him. If the real grantee in this deed was the wife, the plaintiff's title is junior and inferior to that of Martin V. Boughton; the execution sale, if valid as against the latter, transferred his title to the defendant; the latter's entry in April 1877 was under superior title; and his ouster lawful. Thus the execution deed is let into operation. But, if the real grantee in the Boughton deed is the plaintiff, Martin V. Boughton's title vested in her, the execution deed could have passed nothing to the defendant; and so far as respects it his entry was without title and his ouster illegal. Who then is the grantee in the Boughton deed? The defense also claims that, if the plaintiff is the grantee, the deed was not delivered until after the execution deed had been delivered; and if this position is correct, his deed is superior to hers. When therefore was her deed delivered? The virtue of the execution deed hinges on these inquiries. The inquiries involve a consideration of the plaintiff's evidence. She has been repeatedly upon the stand, and under much cross-

examination. She has throughout impressed me as an honest witness. It remains to be determined whether she has also been an accurate one. In weighing her evidence, also in estimating her conduct as a claimant to the title, I must consider that she is a woman unskilled in business; confiding; had an unreliable husband; and naturally and habitually came to lean upon his brother, Martin V. Boughton, as her protector and adviser. Late in 1870 or early in 1871 she was at Bryon with her husband; Martin V. came there and borrowed from him $2,000; she became anxious on account of the loan, and remonstrated against it, and the result was an agreement between the three that Martin V. should deed to her in fee for the $2,000, the lots in controversy; he soon returned to Cheyenne, where he then resided, and employed Thomas J. Street to draft the deed, and see to its execution; Street was a practicing lawyer at Cheyenne, and the evidence of professional experts show that, when sober, he was a careful and precise draftsman of law-papers; the structure of the deed is conclusive that he was sober when he prepared it, and saw to its execution; he must have derived from Martin V. Boughton his knowledge of what the deed was to contain, the name of the grantee included; in asking for the information, his habit of care and precision would govern him.

Martin V. Boughton then furnished to him the name of the grantee, and therefore, as such, the name "Mary E. Boughton," being at the time as familiar with the name of the plaintiff as he was with that of his wife, and knowing that the only distinction between their names was by the plaintiff's middle initial "E.;" the deed having been prepared, he signed and acknowledged it; the deed has been put in evidence, speaks for itself, and is proved to be in Street's hand; the instrument does not mention the name, "Mary Boughton," it does contain the name, "Mary E. Boughton," and three times, and just where it should contain the grantee's name—once in the granting part, next in the habendum, and finally in the covenant; the deed was duly

filed for record on the 18th day of February, 1871, two days
after its date and acknowledgment;• was not so filed by
the plaintiff, and must have been filed by Martin V. Bough-
ton or his conveyancer; it has an endorsed title in these
words, and in the following order:

### DEED.

#### MARTIN V. BOUGHTON

#### to

#### MARY E. BOUGHTON.

—and the endorsement is in a large, bold, clear hand, such
that it would be impossible for any one, handling the docu-
ment, to fail seeing at a glance the entire title: the plain-
tiff visited Cheyenne in June, 1871, immediately called
upon Martin V. Boughton, at his office, asked for the deed,
which he had so agreed to execute to her, and he then pro-
duced, and handed, and thus delivered to her the deed,
which he had so prepared for delivery to her, and had
acknowledged, accompanying the delivery with the remark
that he deeded the property to her, as he had previously
agreed at Bryon to do: having so delivered the deed, and
on the same occasion, he suggested to her that she had
better, for greater safety, leave it with him to keep for her;
yielding to the force of an habitual confidence, she then
handed it back, he receiving it as her custodian, and sub-
ject to her call; it was precisely such a deed as he was
bound to execute to her; he must have known that it ran
to her, and not to his wife as grantee: under that obliga-
tion and with that knowledge he delivered it to the plaintiff
as her grantor, and received it back as her agent, and in the
last mentioned capacity retained it until the latter part of
1877. At Bryon the plaintiff's confidence in Martin V.
Boughton was shaken by his obtaining the $2,000: it was
restored by his agreeing to deed, and soon after, and
promptly upon her arrival at Cheyenne performing the
agreement. He coupled with the delivery of the deed a

delivery of possession, and she received and held possession under the deed until the ouster: and according to his own testimony he did not intimate to her that she was not, and that his wife was the grantee, until on or immediately before December 10, 1875, nearly five years after the preparation, and four and a half after the delivery of the deed. Upon her cross-examination the plaintiff said that she was at Deadwood in the latter part of 1877, and Martin V. Boughton sent it to her: she was then asked how she knew that he sent it back, and answered that she knew it by knowing that she sent to him for it, and it came: she was next and on cross-examination asked, if she did not know that Mrs. M. V. Boughton gave her, the plaintiff's messenger, the deed, and answered, "No! I do not think she did;" later in her evidence the plaintiff stated that, when she got the deed back at Deadwood, Martin V. Boughton and his wife were keeping house together there. To meet this evidence as to the return of the deed, the defense introduced William W. Corlett as a witness, who testified that the plaintiff told him that at Deadwood she sent a party to Martin V. Boughton for the deed, and the messenger brought it back to her representing that Mrs. Boughton gave it to him, the messenger. I accept this testimony of the witness Corlett, as true, and believe that the plaintiff explained to him the return of the deed to her at Deadwood, just as he states that she did. If this evidence of the last mentioned witness was introduced to impeach the plaintiff it fails of that effect: she does not deny either directly or impliedly that the deed was sent back to her by Mrs. Martin V. Boughton; the question whether she did not know that Martin V. Boughton's wife gave the deed to her messenger, was evidently put on the assumption by the interrogator that the messenger did represent to the plaintiff that Mrs. Martin V. Boughton gave it to him to take to her, and in the belief by the interrogator that Mrs. Martin V. Boughton did hand the deed to him, but the answer does not deny that the messenger made the representation, only

expresses the plaintiff's belief that Mrs. Martin V. Bough-
ton did not hand the deed to him; moreover, while it does
not follow, as a matter of course, that Martin V. Boughton
participated in the return of the deed, his wife's sending it
is consistent with the idea that she did it at his request:
but (farther) whoever sent it, the deed came back to its
owner, who had a right to its possession on call, and to
take it whenever and wherever she could find it. But this
testimony of the witness, Corlett, more than fails to im-
peach, it confirms and sustains the plaintiff: proving the
statement made by her to that witness, the defendant claims
that it was true; if true, the representations of the messenger,
accompanying his handing the instrument to the plaintiff,
was a part of the act, and explains it; and, as an explanation,
shows that the paper came back to the plaintiff through
Mrs. Martin V. Broughton—a fact, which conclusively repels
the idea that she had any interest in it (for, if she had, she
must, according to Martin V. Boughton's testimony, have
known it), and which the defense has proved. I am com-
pelled by these considerations to the conclusion that the
plaintiff was the intended, and is the grantee in this deed;
and I must abide in this conclusion, unless it is controlled by
two features of the defense, which I next proceed to notice.

The defense has introduced in evidence an instrument,
which is dated December 10, 1875, purports to have the
signature of the plaintiff, and declares that she never pur-
chased the premises, that the deed was not delivered to her,
and that she had not, and had never had any interest or
claim in the premises or deed. She admits the signature.
Though there is some discrepancy as to the place where,
and the persons who were present when she signed, I
readily find that it was done at her residence in Cheyenne,
and that the only parties present were Martin V. Bough-
ton, Levrett C. Stevens, Celia Bryant, and the plaintiff.
Whether she signed, understanding the instrument, or
ignorantly, and was misled in respect to it, is disputed:
Martin V. Boughton and Stevens, the only witnesses for

the defense upon the subject, asserting that she signed understandingly, the former further stating that the instrument was fully explained to her upon that occasion; Mary E. Boughton and Celia Bryant, the only witnesses for the prosecution upon the subject, testifying in effect that she signed in ignorance, and under deception. Between these contradictions where is the truth? Martin V. Boughton swears that it was three years after the deed was executed —that is, as late as February, 1874, before he discovered the alleged error in it; and that it was about a year and a half later—that is, about December 10, 1875, before he took the step requisite to its correction; and that the plaintiff (to quote his words), "was glad to correct the mistake, and disclaim all right, title and interest in the property." If the alleged error was an error, it is impossible that he should have remained ignorant of it so long; and utterly improbable that, having discovered it, he would not have made haste to obtain a correction—especially from a party whom he describes as eager to correct: the extravagance of this statement is conclusive that it is perjured: it condemns the rest of his evidence, so far as that residue relates to disputed matters, unless corroboration can be found for it in other parts of the case. I can find no corroboration, and therefore lay his testimony altogether aside, as failing to furnish any support for the defense. The statement of the plaintiff, on the other hand, is in entire accord with, and therefore is fully supported by the prior history of the deed, not only as found in her evidence, but as written in the conduct of Martin V. Boughton: to believe that she signed understandingly is to introduce such antagonism of fact, such contradiction and confusion into the case, as would successfully frustrate all rational effort to eliminate the truth, the existence of the paper points directly to the idea that she was deceived into signing it: she explains that she was called upon by Martin V. Boughton and Stevens to witness it, as a paper relating to some business, which was between themselves, and in which she had no interest; that,

believing them, she consented; it was then put upon the table for her to sign, and Boughton, holding his hand over and upon it, as if to steady it for her hand, but so as to cover its contents from her, she signed where they told her to; that the paper was neither read by, or to her, nor stated to her; she adds that no one wrote upon it on the occasion but herself, that they, having obtained her signature, went away with the paper, and that the interview lasted about ten minutes; according to this, she did sign in ignorance of the contents of the paper, and under deception, and the attestation by Stevens, which is upon the instrument, must have been put there after he and Martin V. Boughton had left—a circumstance that tallies with the idea of deception, for, had it been affixed in her presence, and in the usual way of regular and *bona fide* attestations, it would probably, at least might have attracted her attention, and put her upon her guard. Her explanation is plausible in itself; her credulous confidence as a woman, and her habitual trust in Martin V. Boughton, made it easy to deceive her; suspicious conduct, which might well escape her observation at the time, would readily occur to her afterwards, on discovering what the paper was; her explanation is corroborated by Celia Bryant, and is thus doubly fortified by the evidence of an eye-witness, and the antecedents and surroundings of the case. I cannot accept the deposition of Stevens as overcoming this volume of proof; letting alone the further fact that his evidence shows in several places the foot prints of a swift and more than willing witness. I have no doubt that Martin V. Boughton, when he delivered the deed to the plaintiff in 1871, intended to defraud her of it. Were it necessary to decide the matter, I should not hesitate to hold that his consent at Bryon to execute it was given with the mental reservation of this purpose; I have no doubt that in pursuance of the design he induced her, on the occasion of the delivery, to entrust the instrument to him for keeping; that he shrewdly calculated that she did not observe on that occasion the record filing, which is

obscurely endorsed upon it, and might easily have escaped her attention—and would never learn that there was any record evidence of the instrument; and that he intended to let time run upon the transaction, and hence the dead silence between them, upon the subject, between the delivery and the return, for the evidence does not hint that anything passed between them on it during that period; I can readily understand, and I fully believe, that the wife returned the document without his knowledge, and in this connection the fact that the husband and wife were inharmonious, is insignificant; I am clear that the scheme of the instrument of December 10, 1875, was formed to accomplish the fraudulent purpose, that he and Stevens conspired to obtain and did obtain it from the plaintiff by delusion, that Stevens was Boughton's professional hireling in the matter, and that they shaped their whole evidence in the case to conceal and to consummate their iniquity.

E. W. Mann testifies for the defense that in an interview in 1878, the plaintiff told him that the deed had not been delivered to her. This witness had conducted a suit to judgment for the defendant against Martin V. Boughton, based upon an attachment of the premises as his, — Boughton's—property; having obtained the judgment, caused an execution issued upon it to be levied on, and an execution-sale made of the property, as Boughton's; and under his the witness' advice the defendant purchased the premises at that sale, and took the deed, which constitutes one ground of his claim to title; and on the trial of the present issue, the witness, also counsel in this case for the defendant, as such counsel, for the edification of the court and the benefit of his client explained that the theory on which the claim in that suit was attempted to be enforced against the premises as Martin V. Boughton's property, was that the deed, Boughton to Boughton, had been made to his wife, leaving the title in himself. In estimating the evidence of Mr Mann I must see the attitude which he occupied towards the plaintiff during that interview, and by which he would be

likely to interpret it; I must see that he listened to her honestly, believing the deed had not been delivered to her, and that the paper of Dec. 10, 1875, of which he was then aware, had been understandingly signed by, and properly obtained from her. It does not follow from this, that he misapprehended her: it does not follow that he might easily have misapprehended her, and that misapprehension might reasonably be accounted for by a very slight difference of language. He states that he does not recollect all the conversation of the interview, and this circumstance deteriorates from the force of his evidence. To accept his testimony as controlling, I must accept it as controlling what otherwise is a continuous and consistent current of fact, flowing the other way; not as harmonizing conflicts, but as giving conflict to harmony. To accept his evidence then, would be to violate the established rule analyzing contradictory testimony. I do not doubt the sincerity of the witness: I am not satisfied of his accuracy.

The plaintiff being the grantee in the Boughton-Boughton deed, and the Martin V. Boughton title being by it vested in her, was it divested by the tax-sale? Is she bound by a tax put upon her property against a stranger, the tax proceedings being otherwise valid? Tax proceedings, being *in invitum*, are to be construed strictly; and whatever is essential to their validity must be affirmatively shown by the party who claims under them; *a fortiori* if it affirmatively appears that a requisite has been omitted from the proceedings; that will vitiate the alleged title. So far as the Boughton title was concerned, the tax authorities in the matter of the present title were notified by the record that Mary E. Boughton was, and that Martin V. Boughton was not the owner of the premises. In 1876 they were sold for delinquent taxes. From the listing to the sale, both inclusive, he was, and she was not described as the owner of the property taxed; it was taxed to him alone, and all the proceedings were against the property as his. The taxes were laid upon the right property, but to the wrong party —

against a stranger not the owner. He was not interested in protecting the property, and was notified; she was interested in the property, but was not notified; and thus the property was sacrificed by sale, though no delinquency had been committed. A sale of the realty for non-payment of taxes must be based upon a delinquency—a default. There can be no delinquency or default without prior notice to the owner, so as to enable him to pay and prevent sale: hence all the proceedings prior to sale must involve such notice, and connect the tax with the owner, so as to bind property and ownership. The statute, under which the present proceedings were conducted, embodies this principle; if the proceedings violate the principle, they are void. The act is ch. 109 of the Compilation; sections 1–4, both inclusive, declare what taxes shall be raised, and what classes of property shall be taxed. Sections 5–21, both inclusive, are provisions for listing the property as the basis of assessment; each goes to the same purpose, and all are therefore to be taken in connection; they proceed wholly upon the idea that property shall be listed to the owner, and can operate only according to that idea; section 22 provides that the assessment-roll, which is the list and the assessment affixed to it, shall specify the names of the party *to whom any property shall be taxable,*—which means of the owner; and in separate columns *his personal and real property,* which means the property of the owner; section 24, that a party refusing to furnish the assessor with a list of his real and personal property, or with a list of that which he represents as agent, guardian or otherwise, or to take the oath or affirmation prescribed in section 25, and to be administered by the assessor, shall be subject to a penalty; and section 25, that the oath or affirmation shall declare that the party has given in a full and correct inventory of all taxable property owned by him, and of all held by him in such representative capacity; section 26 requires of the assessor an oath, which shows among other things, that he has listed according to ownership: sections 23 and 29, that the assessor shall

return the roll to the clerk of the board of county commissioners by the first Monday of July : that the commissioners shall be a board for the equalization of the assessment of the several persons in the county, substantially in the same manner as is required of the Territorial Board of Equalization to equalize among the several counties of the Territory, as nearly as may be; for that purpose shall sit at time and place specified in the sections; shall add to the roll any taxable property in the county, not included in the roll as so returned, and assess its value — and may increase, diminish or otherwise alter and correct the assessment; "and shall hear and determine the complaint of all persons feeling aggrieved by the assessment of their property, as returned by the assessor;" and the clerk shall notify each party (or his agent,) whose assessment has been so increased, of the fact and amount of the increase, and that party may appear before the board at its next meeting for the purpose of obtaining a correction of the increase, and that any person feeling aggrieved by anything in the assessment of his property, may appear before the board within said time for the correction of the assessment—and that the assessor, when assessing, shall give each person a printed notice of the time and place of the meeting of the board; sections 33, 34, 35 and 38, that a tax-list and warrant shall be prepared, specifying the property taxed, the tax and tax-payer, and direction to collect accordingly; that the collector should demand payment of the tax-payer, before enforcing collection, and only in case of non-payment after a given date may enforce payment, — and that out of the personal property of the tax-payer; and finally, sections 41, 42 and 44, provide that all unpaid taxes shall become delinquent on the first day of November, and shall thereafter be payable to the county treasurer, who shall collect them by sale of the real estate; that, for the purpose of such collection, and as preliminary to sale, he shall give notice by advertisement and posting, specifying the land, and name of owner to whom taxed.

Clearly the provisions for listing and assessing to the owner, and securing to him a hearing before the board of equalization, which is a board of correction, who condition the validity of the tax, as a tax-binding lien, upon the property being taxed to him by name; and the provisions requiring the tax-list and warrant to be made out against the tax-payer, the collector to demand of him before distraining, and the notice of sale to run against him, must be treated as based upon, and as being in continuation of the prior expressed intent; and as assuming that under those prior provisions the owner's name shall be furnished, and shall pass from the roll into the tax-list, warrant and notice. Hence no delinquency or default can be committed by the owner, unless demand shall have been made upon him, and his personal property exhausted by the collector in accordance with the warrant. It is only through such delinquency or default that the land can be reached by sale. It is true that section 48 declares that "no irregularity or informality in the advertisement shall affect in any manner the legality of the sale, or the title of any part of the property conveyed by the treasurer's deed under the act, but in all cases the provisions of the act shall be deemed sufficient notice to the owner of the sale of their property;" but, though under this section the omission from the advertisement of the owner's name might not prejudice the sale, all the proceedings prior to the advertisement must conform to the statute, and to the principle which it proceeds upon, in order that its provisions may work such notice; in law, notice is protection against the defect of the advertisement, unless the efficacy of the sale was made to depend upon the validity of the proceedings which precede advertisement. Two considerations illustrate the necessity of taxing real estate to the owner, as a condition of validity; section 41 provides that the personal taxes shall be a lien upon the real estate, and according to the prescribed and necessary method of the roll and tax-list, the taxing of real estate to a stranger would fasten upon it his personal taxes; and constitutional

law forbids the levying of a tax, before the owner has had an opportunity to object to the assessment. The tax title is otherwise defective. The assessment, as returned by the county assessor, is inchoate. According to section 28 it must next be revised by the county board of equalization; and from that board, so revised, it must go under sections 30, 31 and 32 before the territorial board of equalization, whose duty it is to sit on the 4th Monday of July in the same year, and, with reference to the territorial tax, shall equalize county assessment between the counties and towns as to the valuation of real estate, by adding to the aggregate valuation of that property in each county where valued below its proper valuation, a percentum that will raise it to its proper valuation; and by deducting from the aggregate valuation of such property in each county, when valued above its proper valuation, such percentum as will reduce it to its proper valuation.

From this board so revised, it must be certified under section 32 to the county clerk, and the county commissioners are then, and not till then, and under section 33, to levy upon it the requisite taxes. The evidence contains proof of the making and return of the roll by the county assessor to the clerk, and that subsequently and in August of the same year (1876), the commissioners made this order, "that the following levy of taxes be made upon the assessed valuation of taxable property of Laramie county, for the various purposes and in proportion set forth below, as follows," and next follows in the order a schedule of rates for territorial and county purposes. The evidence contains no proof that the roll, as so returned by the assessor, was revised by either of the boards, or was put before either for revision. It is true that the clerk's certificate, attached to the tax-list, states that it was based upon the original assessment list, as revised by the county board; but though it may be proper for the clerk to certify the part for the assistance of the collector and tax-payer, the court must learn it, not by adopting the clerk's statement, but by the

evidence appropriate to establish it,—and that is the record
proof, for each board is required to make a record of its
revisions.  Consequently it does not show that his assess-
ment was perfected, and a basis existed for the levy of the
5th of August: for aught that appears, the levy was made
upon the roll, or returned by the assessor, with nothing
done to complete it, and as the proceeding next in order
after the return.  Further, section 33 forbids the commis-
sioners from levying before the fourth Monday in August,
unless the statement of revision has been earlier furnished
from the territorial board—thus allowing till that date for
the furnishing of the statement, as a basis of levy; the
present levy was made on August 5th; hence, there being
no evidence to justify the making of it before the fourth
Monday, it was premature, powerless and void.  This con-
stitutes a radical error.  Again, section one provides that
two mills on the dollar shall be annually levied for territo-
rial revenue, when no rate is directed by the territorial
board of equalization; and that the tax for this revenue
shall in no case exceed three mills on the dollar; so that the
two-mills rate is the ordinary, and that directed by the
board the extraordinary rate; the first to be presumed, the
last to be specially proved.  Sections 32 and 33 provide
that the auditor, who is a member of that board, shall by
the last Monday in August notify the clerk of the county
commissioners of the rate of territorial tax that has been
determined upon, and that, the clerk having received from
the auditor a statement of the equalization and notice of
the tax determined on by that board, the county board
shall proceed to levy the requisite taxes accordingly; but
that, if by that date, the clerk shall not have received
notice of a rate as determined upon by the board, the two-
mills rate shall govern.  The evidence contained no proof
that the territorial board had determined upon an extra-
ordinary rate for the territorial revenues: and therefore no
authority to the county board to levy the three-mill tax for
the Territory.  This constitutes a radical defect.

Again, the tax-list and warrant are to be founded upon the assessor's roll so revised, and the rates so applied to it, as above explained. The evidence contains proof that a tax-list and warrant were prepared, but no proof that before the sale any distraint was attempted, or demand made for the payment of the taxes levied against the premises; nor even that the list and warrant were delivered to the collector. This constitutes a radical defect.

It is unnecessary to consider other objections that may exist in the tax proceedings; it is apparent from what I have considered, that, as the evidence stands, the proceedings that preceded the sale, were void; consequently that sale was unauthorized and void, and the tax deed conveyed nothing.

I hold, therefore, that the plaintiff was, at the time of the ouster, legally entitled to the possession of the premises in controversy; that the ouster was illegal; and that she may recover the possession and the *mesne* profits. An order for such judgment will be appended at the foot of the findings.

I regret to deprive the defendant of the benefit of purchases, which he has made in good faith. I should more regret to deprive the plaintiff of property to which she is justly entitled.

Judgment affirmed.