**CITY OF ARLINGTON et al.**

v.

**CANNON et al.**

No. 15461.

Court of Civil Appeals of Texas. Fort Worth.

Nov. 27, 1953.

Rehearing Denied Jan. 8, 1954.

Crowley, Hudson & Keltner, and James E. Wright, Fort Worth, for appellants.

Martin & Moore, and Elvin E. Tackett, Fort Worth, for appellees.

MASSEY, Chief Justice.

From a judgment granting a permanent writ of injunction to two classes of owners of taxable property in the City of Arlington, Tarrant County, Texas, staying the collection of taxes on their properties for the year 1952 by said City, the City of Arlington appeals.

Judgment affirmed.

During the years. of 1951 and 1952 the legally incorporated City of Arlington, Texas, an appellant herein and a defendant in a petition for injunction in the District Court of Tarrant County, Texas, had a phenomenal growth as result of an announcement of intent to locate followed by location nearby of substantial industries. The development occasioned considerable inflation of real estate values as

compared with the normal enhancement of value as respects dollar valuation theretofore experienced. This situation presented an unusual problem for the taxing authorities of the City of Arlington relating to the 1952 tax levy.

By way of voluntary rendition of property many property owners laid the foundation whereby their property was placed upon the tax rolls of the city for 1952. By way of involuntary assessment of the properties of other property owners, the tax assessor for the City of Arlington caused other property to be placed upon the tax rolls for such year. The Board of Equalization for the City of Arlington met for the purposes prescribed as to such official bodies. This Board raised the valuation on certain properties to an amount greater than the values shown by the owners rendering the same, and also raised the valuation on certain properties not rendered, but assessed by the tax assessor, to an amount greater than the values so assessed by him. As to properties voluntarily rendered the city sent out written notices advising the persons rendering such properties of the raise and setting a time for complaint thereof by those of the persons affected who desire to complain. As to those persons who had not rendered their properties, but whose properties had been assessed by the tax assessor, which assessed values were raised by the Board, no written notices were sent out. There were 227 persons in this category at the time the suit for injunction was brought. From the evidence in the statement of facts and also from the briefs of the parties to the appeal it appears that at the time the suit was brought the Board of Equalization purportedly had completed all the work it had to do in connection with the 1952 taxation and had been dissolved, with all the taxes finally levied for 1952.

As to both classes of persons, those who rendered their properties and had the valuations thereon raised by the Board of Equalization, and those who had not rendered their properties but had such assessed by the tax assessor and then raised as to valuation by the Board, it appears that the Board sought to value each piece of real estate which was an item of property to be taxed by placing on it what was considered to be the "value with the inflation taken out of it", and then taking 60% of such figure and making it the final value for tax purposes. In no case did the Board take the market value of such real estate as of any certain time for determining such value by considering what it would sell for on the open market as of such time, but arbitrarily collectively agreed through its members as to what the property "ought to be worth" but for the "inflation" occasioned by the announced and initiated industrial development above mentioned, which the members of the Board deemed to have caused a distortion of the true values of the property, and which distortion they deemed to be temporary. It was with all good intention that the members of the Board tried in the performance of their duties as such to arrive at values which would be fair to all the taxpayers of the City of Arlington. They honestly believed, and perhaps correctly so, that the method they used would more nearly accomplish this result than would be the case should they use any other method. It may be that in the majority of instances the Board was correct, and that passage of time will demonstrate this. Such could only be demonstrated after a few years' time when the "inflation" that the Board desired to disregard as to 1952 values has been sifted out of the real estate in the City of Arlington, and there can be observed market transactions wherein real estate is bought and sold by individuals under no compulsion. In other words, there will be persons at that time selling real estate at prices which are perhaps only one-half the amount the same property sold for in 1952. By the same token, perhaps there will be prices on certain parcels of real estate then which will be even greater than such parcels sold for in 1952.

As to stocks of merchandise the Board of Equalization took 80% of the inventories thereof in cases where the taxpayer's

depreciation had not already been taken off, then took 60% of the resulting figure to be the value of the stock of merchandise in order to arrive at a true or depreciated value for tax purposes. Where the taxpayer's depreciation had been taken off, the Board took 80% of such figure to be the true or depreciated value for tax purposes as to such a stock of merchandise. In the former instance no consideration was taken of whether the merchandise in question was more susceptible to depreciation than other types of merchandise of other kind, and no consideration was taken of whether any proportion of the whole stock of merchandise was more susceptible of depreciation than other parts of the whole stock of merchandise of the particular owner of a particular stock. The Board did use cash market valuations as of January 1, 1952, as the yardstick for valuing stocks of merchandise. As applied to stocks of merchandise of lumber yards and oil companies the Board took 80% of the inventories for the assessable values rather than the 60% taken in the case of other characters of stocks of merchandise.

There were other properties, such as household furniture, stocks, bonds, notes, mortgages, and money in banks which were not assessed, and there was certain real estate in the form of rather narrow strips connecting the City of Arlington proper with location of certain industrial properties which were incorporated into the municipality (and which were actually a rural type of property or agricultural property) which was not taxed.

Suit was a class suit on the part of certain named property owners of the City of Arlington, for the benefit not only of themselves, but likewise for the benefit of all other persons in the City of Arlington similarly situated as the named plaintiffs regarding 1952 taxes. The prayer was that the collection of the 1952 tax assessments of Arlington be enjoined.

The trial court, holding that the arbitrary measure or yardstick of value applied in the case of real estate by the Board of Equalization of the City of Arlington amounted to no measure or yardstick at all and that use thereof resulted in disproportionate valuations for tax purposes, holding further that the intentional failure to tax certain properties and the measure or yardstick used to tax stocks of merchandise was not equal and uniform taxation, and holding still further that no notices of any kind were given in writing to the taxpayers whose names appeared on the unrendered tax rolls for 1952 whether or not the assessed valuation of their property was raised by the Board, held that it was authorized to and should enjoin the collection of taxes in certain instances and as to certain classes of persons. It entered its judgment permanently enjoining the City of Arlington, its Mayor, its Commissioners, its Tax Assessor-Collector, and the members of the Board of Equalization from attempting to collect taxes for the year 1952 based upon the values as theretofore fixed by the Board of Equalization from the named plaintiffs and other taxpayers of the City of Arlington falling into the categories:

1. Those whose names appear on the rendered rolls for 1952, and where the property valuation as rendered was raised by the Board of Equalization.

2. Those whose names appear on the unrendered rolls for 1952 but who had their property assessed as to value by the tax assessor of the City of Arlington, and where the property valuation as assessed by the tax assessor was raised by the Board of Equalization.

Though the order entered by the court extended in its operation only to the two classes of taxpayers stated, as we understand the injunction, what was enjoined was the recovery by the City of Arlington of any taxes based upon assessments which were in turn based upon values erroneously and wrongfully arrived at, and which were so arrived at by the Board of Equalization rather than by the property owners themselves or by the tax assessor. The question on appeal is confined to the propriety of

such act of the court, considered only as such act relates to these two classes of persons.

The trial court excluded from the effect of the judgment those taxpayers who though otherwise under protection of the writ of injunction had already paid the taxes assessed them, and likewise excluded such taxpayers who might voluntarily pay the taxes as assessed after the writ was granted.

The City of Arlington and the other defendants to the original suit appealed, appear before us as appellants, and urge the vacation of the writ of injunction issued from the trial court, or in the alternative, ask that such court's judgment be reversed and the cause remanded for another trial.

The Constitution of Texas, Article VIII, Section 1, Vernon's Ann.St., reads in part as follows: "Taxation shall be equal and uniform. All property in this State, whether owned by natural persons or corporations, * * * shall be taxed in proportion to its value, which shall be ascertained as may be provided by law. * * *"

Pursuant to the authority of this Article, and likewise to comply with its mandate, the Legislature of the State of Texas provided by law the way and manner of ascertainment of the value of the property in question for the purpose of taxation. A material statute to the question involved is T.R.C.S.1925, Article 7174. Both appellants and appellees agree that this Article applies to municipal taxation.

T.R.C.S.1925, Article 7174, provides in part as follows: "In determining the true and full value of real and personal property the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation, nor shall he adopt as a criterion of value the price for which such property would sell at auction or a forced sale or in the aggregate with all the property in his county; but he shall value each tract or lot by itself, and at such sum and price as he believes the same to be fairly worth in money at the time such assessment is made.

\* \* \* \* \* \*

"Personal property of every description shall be valued at its true and full value in money.

"Money, whether in possession or on deposit, or in the hands of any member of the family, or any other person whatsoever, shall be entered in the statement at the full amount thereof.

"Every credit for a sum certain, payable either in money or property of any kind, shall be valued at the full value of the same so payable. If for a specified article or for a specified number or quantity of property of any kind, it shall be valued at the current price of such property at the place where payable. Annuities or moneys payable at stated periods shall be valued at the price that the person listing the same believes them to be worth in money."

By its Charter, the City of Arlington provided for the appointment of a Board of Equalization and defined its powers to be those defined by T.R.C.S.1925, Articles 1049 to 1056, inclusive. T.R.C.S.1925, Article 1053, reads as follows:

"In all cases where the board of equalization shall raise the value of any property appearing on the lists or books of the assessor, they shall, after having examined such lists or books and corrected all errors appearing therein, adjourn to a day not less than ten nor more than fifteen days from the date of adjournment, such day to be fixed in the order of adjournment, and shall cause the secretary of said board to give written notice to the owner of such property or to the person rendering the same of the time to which said board has adjourned, and that such owner or person rendering said property may at that time appear and show cause why the value of said property should not be raised. Such notice may be served by depositing the same, properly addressed and postage paid, in the city post office."

As we have seen, those persons who had rendered their property, and which was increased as to value, were properly notified and had an opportunity to appear and show cause why the property valuation should not

be raised, but there was no notice given to the owners of property which was not rendered by them, and where the valuation of such had been made by the city's tax assessor. These properties, which made up the unrendered roll, constituted property which in the opinion of the Board of Equalization was of a total value more than double the total value of the property on the rendered roll. There were some notices put in the newspapers of the city of the hearings of the Board of Equalization upon such increases, but testimony upon the trial from persons whose properties were on the unrendered rolls established that they never knew of such hearings. There was also testimony from persons who had rendered their properties, the valuation of which was raised by the Board of Equalization, that they had never received written notice of any hearing, nor did they have actual notice by any other means.

We hold that Article 1053 is mandatory in its nature, and substantial compliance with the provisions thereof as to the giving of notice and as to the manner and form thereof was shown to have been absent in the procedure of the Board of Equalization of the City of Arlington. A prerequisite to the validity of any increase under the statute is notice in accordance with the statute, except in such cases where such prerequisite is waived by a person's voluntary appearance and protest as to the increase. And in all cases except where such appearance actually appears the increase is void. 31 Tex.Jur., p. 379, § 12; 30 Tex.Jur., p. 489, § 270; 40 Tex.Jur., p. 138, § 100, and p. 162, § 117; City of San Antonio v. Hoefling, 1897, 90 Tex. 511, 39 S.W. 918.

An examination of the City Charter of the City of Arlington reveals no provision for remedy by way of an appeal to any court or commission. Therefore, such remedy as was available would be in the District Court, to which Court recourse was had with a prayer for an injunction. This would be so as to those persons who were notified of the hearing and who did appear and who were dissatisfied with the action of the Board, as well as those who were not notified at all.

The general basis for the application for writ of injunction was the illegality of the whole of the assessment and not merely the illegality of the percentage or part of the assessment resulting from an excessive evaluation. No amount in either the aggregate of cases nor in any particular instance was alleged. However, this was a class action and allegations of a fundamentally wrong premise in arriving at values was alleged, application of which demonstrated a violation of Article VIII, Section 1 of the State Constitution and injury resultant or to result to the complainants and other persons similarly situated. Allegation of specific amounts claimed to be the extent of the unlawful assessments or claimed to be the extent of illegal evaluation for purposes of assessment being impractical if not impossible to be shown in the class suit so filed, remedy by way of injunction will not be prohibited. Injunction will lie for the further reason that the alleged unlawful assessments may constitute a cloud upon the title to the real estate involved, and likewise this remedy will lie in order that a multiplicity of suits may be avoided. City of Houston v. Baker, Tex.Civ.App. Galveston, 1915, 178 S.W. 820, error refused.

The writ of injunction restrained the whole of the tax assessments made to two particular classes of persons under the theory that wherever and whenever the Board of Equalization applied the system of property evaluation it did apply, the right of such persons to be taxed according to equal and uniform standards was violated.

Judge Stayton, in the case of Norris v. City of Waco, 1882, 57 Tex. 635, stated that taxes are "equal and uniform" within the meaning of the constitution "when no person nor class of persons in the taxing district, whether a state, county, or other municipal corporation, is taxed at a different rate than are other persons in the same district upon the same value

or the same thing, and where the objects of taxation are the same by whomsoever owned, or whatever they be."

■ The State's Constitution merely guarantees uniformity and equality of taxation. Its mandate in this regard is satisfied when such uniformity and equality has been attained. Druesdow v. Baker, Tex. Com.App.1921, 229 S.W. 493.

■ However, to have uniformity and equality of taxation, the valuations as to property must be established by some standard, and after such valuations are established, the taxation based upon such valuations must be levied by a standard. Only thus may there be preserved unto the taxpayers their constitutional guarantees; and only thus may an injury to any one (resulting in a corresponding benefit to the others) be avoided. An individual taxpayer is injured if the tax-value of his property is (in proportion to other properties) too high, and he is injured if the tax levied on a correct valuation is proportionately too high a tax. In either instance the market value of his property is decreased, for as between two properties equal in value in all other respects, the more desirable property is that on which the present tax is the lesser, and the same is true as to that property on which the future tax is likely to be less. In either instance the taxpayer's payment of a higher tax than he should to support his government reduces the burden of the other taxpayers. And whereby from an overall picture it may be seen that ⅓rd of the body of taxpayers, possessing ⅓rd the value of the property of a municipality, are paying 50% of the taxes to maintain the municipal government, the other ⅔rds of the taxpaying body carries only one-half the burden it should. Of course, a person who should be taxed, but is not, carries no part of his rightful burden at all, though such burden, of necessity, is carried by those persons who do have to pay taxes. Whenever any systematic procedure of taxation is purposely followed with intended result the imposition of greater tax burden upon some person or group of persons than upon the other members of the taxpaying body, the operation of the system may be enjoined.

■ T.R.C.S.1925, Article 7174, provides the standard or "yardstick" for valuation of property. It prescribes a standard for real estate and one for personalty. Then it prescribes a standard for money and for credits measurable in money. The statute prescribes that the value of the property to be taxed is to be determined by what it can be bought and sold for. Lively v. Missouri, K. & T. Ry. Co. of Texas, 1909, 102 Tex. 545, 120 S.W. 852, and the cases following the holdings thereof. It naturally follows that unless the ultimate result of the system used by the City of Arlington to establish its tax levy for 1952 would be substantially the same as the ultimate result had the value of the property taxed been based on its market value (that is what it can be bought and sold for), it is not only the letter of the statute which has been disregarded but it is likewise its spirit, all in derogation of the Constitutional guarantee made to owners of property in Arlington by Article VIII, Section 1, of the State Constitution. This is so because substantial injury to a large class of the taxpaying body is the natural result. 26 R.C.L., p. 247, sec. 219.

■ Careful observation and consideration of the method followed as to real estate in Arlington reveals that the Board of Equalization intentionally assessed the taxes thereon premised upon hypothetical and speculative values believed by the members of the Board to ultimately, or at least at some later date, be and become the true market values of the same. Such values were purposely contrary to the then current values and to past values. Instead, values were established by speculatively fixing the value at what the members believed would be the ultimate or prospective market value once the undue inflation of the times were past. Such cannot legitimately be the basis of determination of present value. 40 Tex.Jur., p. 149, § 108. In general the board members

applied the "foresight" rather than the "hindsight" test to the values. Fortunes have been made in the past and will be in the future, not because human foreseeability is usually good, but because by and large and to the great majority it is more often bad. As to the real estate assessments, the application of the method used by the Board of Equalization resulted in valuations materially different from the values which would have been found by following the statutory provisions, and therefore there was material prejudice resulting to certain taxpayers, including the appellees.

Let us examine some of the evidence in the case to see whether it was actually demonstrated that the ultimate result of the tax assessment method used by the Board resulted in substantial injury to appellees. We think it is sufficient to refer to the case of the lot and buildings of one taxpayer. The Board of Equalization assessed the value of the property at $35,000, while the members of the Board admitted that the property, which was completed in 1951, was worth at least $126,000 as of January 1, 1952, in so far as its then market value would be concerned. The residence of a certain other taxpayer, however, was assessed at $3,500 when the highest offer that he had received for his house and lot was $1,750. The evidence also showed other instances of variation in assessments, many of which varied from great to small percentages of true market values at times during or in any degree proximate to 1952. Those whose assessed valuations were low naturally benefitted, while those whose assessed valuations were high stood exposed to detriment. In both instances the tax exposure was inequitable, but it was the latter class of persons, among which class stand the persons benefitting from the writ of injunction which issued, who would be substantially injured.

Application of the measures different from those prescribed by statute to the stocks of merchandise it did tax likewise resulted in taxation of the owners thereof in a manner materially at variance with the "equal and uniform" requirement of the Constitution. Evidence adduced upon the trial showing market values of stock of merchandise of different taxpayers on January 1, 1952, showing likewise the proportionate taxation figures which resulted from application of the formulae heretofore described, demonstrated resulting inequities and substantial injury or exposure to injury on the part of those whose tax figured proportionately higher than that of his neighbor.

The end result of the program of taxation for 1952 adopted by the Board of Equalization of the City of Arlington amounted to an inequitable and fundamentally wrong system of taxation, and substantial injury or threatened injury resulted to certain of the City's taxpayers, including the persons protected by the injunction. This resulted, not because of the increases in valuation made by the City's Board of Equalization, but because such increases in many instances raised the tax valuation to an amount greater than would have been such valuation had a proper system of taxation been adopted and applied. Likewise, it resulted because the resultant tax burden was or would have been inequitable and injurious to taxpayers thereby required to pay taxes whenever their property was purposely over-evaluated or whenever the property of others was purposely under-evaluated. This was the end result which was occasioned or threatened by the method of the Board.

Judgment of the trial court is affirmed.