**J. RAY McDERMOTT & CO., Inc.,**
a Corporation, Appellant
(Plaintiff below),

v.

**Walter W. HUDSON, Richard J. Luman, and William M. "Scotty" Jack, Constituting the Board of Equalization and Public Service Commission of the State of Wyoming, Appellees (Defendants below).**

No. 3056.

Supreme Court of Wyoming.
April 11, 1962.

Guy & Phelan, George F. Guy, Ward A. White, Cheyenne, for appellant.

Norman B. Gray, Atty. Gen., and James R. Mothershead, Sp. Asst. Atty. Gen., Cheyenne, for appellees.

A. G. McClintock, Cheyenne, amicus curiae for Forest Oil Co.

Before BLUME, C. J., and PARKER, HARNSBERGER and McINTYRE, JJ.

Mr. Justice PARKER delivered the opinion of the court.

This is an appeal from a judgment of the district court affirming four board of equalization decisions fixing the tax valuation of oil which was produced by plaintiff in the Ash Creek Fields but for lack of pipeline facilities there was trucked at plaintiff's expense to Salt Creek, the point of sale, some 138 miles distant.

For 1952, the first year of operation, plaintiff reported on the form provided by the board the full selling price of the oil without deducting any transportation charges. For 1953 and 1954, plaintiff reported the selling price less the cost of transportation to the pipeline. These figures were not questioned, and plaintiff paid the tax on that basis for 1953 and 1954. In 1956 the board challenged plaintiff's deduction for trucking charges, and set the 1955 valuation without allowance for transportation. Plaintiff protested but did not appeal to the court and paid the tax. When the board refused to allow trucking charges as to the 1956 assessment, plaintiff appealed to the district court. There all evidence regarding the propriety of the tax and method of computing it was excluded on the theory that such matters had previously been considered by the board and were not competent. This court reversed the judgment because of that ruling and remanded for further proceedings. J. Ray McDermott & Co. v. Hudson, Wyo., 348 P.2d 73. Meanwhile, the valuation decision had been made by the board on the production for 1957, 1958, and 1959, each of which had been appealed to the district court. The four cases, being similar, were consolidated for trial. After hearing evidence which included testimony as to the board's method of computing valuation, the court affirmed the board in each of the cases, and the matter is now here on appeal.

The pertinent constitutional provision concerning the tax in question is Art. 15, § 3, Wyo.Const., "All mines * * * from which * * * mineral oil * * * is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion to the value thereof." Other portions of the constitution which must be borne in mind in a consideration of the problem are Art. 15, § 9, directing the legislature to provide by law for a state board of equalization; Art. 15, § 10, delineating the duties of the board; Art. 15, § 11, "All property, except as in this constitution otherwise provided, shall be uniformly assessed for taxation"; and Art. 1, § 28, "All taxation shall be equal and uniform." The provision of Art. 1, § 6, Wyo.Const.,

similar in effect to § 1, amend. XIV, U.S. Const., is also of underlying importance, "No person shall be deprived of * * * property without due process of law."

The statutes directly in issue are § 39-222, W.S.1957, "The gross product of all mines * * * from which * * * petroleum, or other crude mineral oil * * * may * * * be produced * * * shall be * * * assessed for taxation, and taxed * * * in lieu of taxes upon the land"; § 39-223, W.S.1957, which relates to the filing of the assessment schedules; and § 39-224, W.S.1957, "The state board of equalization shall, as soon as the board is in possession of the facts, classify and prescribe and fix the valuation, each year, for the assessment of the gross product, in * * * gallons * * * of all mines * * from which * * * petroleum, or other crude or mineral oil * * * is produced." Of significance also is a portion of § 39-26(a), W.S.1957, dealing with the equalization of assessments and § 39-26(*l*), W.S. 1957, directing the board to prescribe forms and uniform valuation systems:

"§ 39-26. Duties generally.—It shall be the duty of said board to make all necessary rules and regulations for the performance of its duties * * *.

"(a) * * * To * * * compare the returns of the assessment of the property in the several counties, * * so that all taxable property in the state shall be assessed at its true and full value * * *."

"(*l*) * * * to the end that all property may be uniformly valued the board shall prescribe the system or systems of establishing such uniform valuation of all properties, both real and personal * * *."

From the outset, it must be borne in mind that according to the concession of both litigants the oil is to be valued for taxation purposes at the wellhead and that both agree, in accordance with the holding in Oregon Basin Oil & Gas Co. v. Ohio Oil Co., 70 Wyo. 263, 248 P.2d 198; Miller v. Buck Creek Oil Co., 38 Wyo. 505, 269 P. 43,

73 A.L.R. 821; and First Nat. Bank of Chicago v. Central Coal & Coke Co., D. Wyo., 3 F.Supp. 433, that the gross product tax is one upon personal property.

Plaintiff charges that the decisions of the board were illegal, fraudulent, unconstitutional, arbitrary, capricious, and a grave abuse of discretion. Its principal contention is that the amount on which it should pay is the market value of the oil at the wellhead and since there is no sale for the product at such point the true market value is the amount received less the sum necessary for transportation to the place where the market exists and that the assessing of the difference between that amount and the posted field price is a tax on transportation rather than the gross product. Although the testimony of the witnesses might be subject to some ambiguity, posted field prices, as we understand them, do not necessarily connote a market but are those prices contained in bulletins issued by oil companies for points at which the value of crude oil is of some importance, either in arranging settlements between interested persons or for purchase. In this State at the places where there is a main pipeline tariff point the prevailing posted field prices are fairly uniform.

Defendants' position in brief is that the present valuation is beyond challenge. In support they urge that the board is the only entity which can determine fair value, that uniformity is of utmost importance and here was achieved by classification, and that any other method employed would be impractical, rob the board of its rightful authority, and result in serious administrative difficulties.

There is no dispute in the facts. The Ash Creek Fields are relatively small with no pipeline facilities, and the oil produced there cannot be advantageously sold except at main pipeline tariff points. Plaintiff made some effort to dispose of it and accepted the only reasonable offer at Salt Creek. The trucking charges which were necessarily borne by plaintiff were normal but were substantial, being approximately

one-fourth of the selling price of the oil. The tax valuation established by defendants was the posted price of the nearest field for which bulletins were issued, in this case, Meadow Creek; but the Meadow Creek prices were approximately the same as those for Salt Creek, only a few miles distant. The basic issue in the case is the propriety of the board's valuation of plaintiff's oil.

Witnesses outlined the dealings between oil companies in the purchase and sale of crude, noting that at fields away from main pipeline tariff points there was sometimes established by the oil companies an "adopted price" which was the nearest posted field price less the cost of trucking from the wellhead. According to the uncontroverted evidence, the adopted price method was used in sales between oil companies, a producer in all instances bearing the trucking charge and receiving only the posted field price less the cost of transportation. Plaintiff also presented evidence indicating that the Geological Survey, United States Department of the Interior, in arriving at the royalty to be paid on Government oil lands employed a formula by which the cost of transportation of the product from the wellhead to the main pipeline tariff point was deducted from the posted field price. Numerous cases from courts of states which collect license, privilege, or occupation taxes are cited by plaintiff, and attention is called to such holdings wherein the cost of transportation from the wellhead to the point of sale is authorized to be deducted from the market price in establishing the basis of taxation. While practices of the oil companies concerning sales of crude in fields such as Ash Creek, the criteria used by the Geological Survey in fixing royalty charges, and the reasoning of courts in cases dealing with specific rather than ad valorem taxes all relate to questions of valuation and merit careful consideration, it is obvious that they present no solution of the present problem, which can be solved only by reference to our constitution and statutes.

It is claimed by defendants that any ruling which would allow a deduction of transportation costs in the fixing of tax valuation would be an entering wedge for the oil companies to claim all operational expenses, including depreciation, as an exemption. This fear is unfounded since the constitutional provision for the taxation of the gross products of mines does not admit of such an interpretation, and this is especially true in view of the fact that the concept of the tax is valuation at the wellhead. Defendants also maintain that any necessity of the board's considering transportation as an expense would erode its authority and make the valuation a more or less automatic act. On the contrary, we think that the valuation method which has been adopted by the board in these cases was little more than clerical as it requires no extensive knowledge, and certainly no discretion, to copy posted field prices from other areas and use these as the valuation for tax purposes.

In justifying the position that fair value is whatever the board says it is, defendants call attention to § 39–82, W.S.1957. They point out that the statute in its original form provided for assessment of real estate at "its true value in money at private sale," that by subsequent amendment (§ 1, c. 201, S.L. of Wyoming, 1955; § 1, c. 171, S.L. of Wyoming, 1957) it was changed to read, "all taxable real and personal property is to be valued and assessed at a fair value in conformity with values and procedures prescribed by the State Board of Equalization in conformity with * * * [§ 39–26], and other applicable laws." They further urge that § 1, c. 56, S.L. of Wyoming, 1959, applying to county assessors, provides, "The term 'fair value' * * * is hereinafter defined as a fair value in conformity with values and procedures prescribed by the State Board of Equalization," and that § 39–26(*l*), authorizes the board to prescribe systems of establishing uniform valuation of all property, both real and personal. Counsel then say that the board is "left to its own *reasonable* devices in fixing valua-

tion" (emphasis supplied), and that "it appears to be the legislative intent to entrust completely the matter of tax valuation of property to the exercise of the intelligent and informed discretion of the Board—free, of course, from fraud or *intentional disregard of substantive law controlling the exercise of such discretion.*" (Emhpasis supplied.) We do not disagree with these statements, but we have supplied emphasis to two areas which are of importance in the instant case.

█ Although the discussions upon this subject in many jurisdictions reflect the existence of pertinent constitutional or statutory provisions relating to tax valuation, the rule is well settled that the value of personal property for purposes of taxation should be estimated according to the fair actual cash market value or the price that the property would sell for in cash in the usual course of business. M & M Woodworking Company v. Chambers, 217 Or. 161, 314 P.2d 272, 275, 317 P.2d 920, 925, 339 P.2d 718; Hammermill Paper Co. v. City of Erie, 372 Pa. 85, 92 A.2d 422, certiorari denied 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1367; W. L. Harper Co. v. Peck, 161 Ohio St. 300, 118 N.E.2d 643; Willard Storage Battery Co. v. Peck, 161 Ohio St. 197, 118 N.E.2d 514. Throughout cases of this nature will be found the rule which was stated in State ex rel. Greenwood v. Pearson, 46 Wyo. 307, 26 P.2d 641, that tax authorities should take into consideration all factors which relate to value. See also Hackensack Water Co. v. Division of Tax Appeals, State Dept. of Taxation & Finance, 137 N.J.L. 599, 61 A.2d 187, 2 N.J. 157, 65 A.2d 828.

Defendants urge that the precise question before us was determined in Atlantic Refining Company v. Oklahoma Tax Commission, Okl., 360 P.2d 826. It is true as contended that such case affirmed a ruling of the commission disallowing deductions of transportation costs in fixing the value of

oil, but there were several factors which distinguish it from the case at bar. In the areas [1] of Atlantic's production, there were posted field prices. Oklahoma has no constitutional provision for the taxation of gross products of mines and oil wells, and the tax there under consideration was based upon a statute which provided for a percentage tax on the "gross value" of the production. The Oklahoma court recognized the fact that the statute imposing this tax provided for monthly reports showing the "actual cash value" of the production, but said that this was procedural and emphasized as substantive the portion of the statute which required a tax on the "gross value of the production." The commission, since it took over the enforcement of the act in 1931, had consistently construed the term to mean the posted field price in the field or area where the oil was produced as had the State Auditor who had been originally charged with the administration of the act. In 1955 the legislature broadened the gross production tax by making uranium subject thereto and in the new statute defined the term "gross value" as being "the value of ore immediately after being mined or produced, therefore, the amount received or the amount that could or should have been received." Atlantic contended that this definition should control, but the court held that the act levying the tax on uranium properties did not amend the gross production tax in controversy and that the legislature, therefore, intended the original law to stand as it existed, and the administrative construction that had been placed thereon to also stand.

Defendants rely upon Bunten v. Rock Springs Grazing Ass'n, 29 Wyo. 461, 215 P. 244, for the view that exact justice in matters of taxes is not possible nor is it likely that entire concurrence in what constitutes such justice will ever be obtained. Plaintiff quotes the same case for the view that a discrimination against a taxpayer in

1. In a former opinion for which the one at 360 P.2d 826 was substituted "area" and "field" were defined as "a general area underlaid by one or more adjacent common sources of supply."

the assessment of property is not only a fraud against him but also violates the constitutional provision relating to uniformity. Defendants place considerable emphasis upon the statement in State ex rel. Greenwood v. Pearson, 46 Wyo. 307, 26 P.2d 641, 642:

" * * * it affirmatively appears herein that the board acted honestly and in good faith. The judgment of its members may be wrong; but, if it is, the remedy, in view of the provisions made by the Legislature, does not lie in the courts, but lies in showing and persuading the board of the error of its judgment. * * *"

This statement cannot be isolated from the remainder of the court's remarks, 26 P.2d at 643:

"Something is said in the brief of counsel for the defendants as to the 'peculiar' method of fixing values adopted by the board, and that it is erroneous. It is not pointed out in what respects it is so. According to the testimony, the board took into consideration substantially *all factors* having relation to values. * * *" (Emphasis supplied.)

No doubt in making this pronouncement Judge Blume had in mind what he had previously said in the Bunten case, 215 P. at 251, "discrimination may arise in various ways, for instance by the adoption of a wrong or illegal rule, principle, or method; and an unjust tax resulting therefrom has frequently been enjoined as illegal."

The method of fixing the valuation of plaintiff's property was disclosed by the testimony of the Director of the Ad Valorem Tax Department at the 1959 hearing when he said:

"Q. Well, why did you not allow the deduction of the trucking charge? A. Because we don't think the trucking charges are a proper deduction for assessed valuation purposes.

"Q. May I ask you this question: Is the purpose or the function, in your opinion, of this Board to arrive at a wellhead value of oil to fix value for production tax purposes? A. Whenever possible, yes.

"Q. Well, wouldn't the wellhead value in this case be the amount received by McDermott less what it costs McDermott to get the oil from the wellhead to the point of sale? A. May I answer it this way: I think there is a difference between the valuation that you are referring to and a valuation for taxation purposes.

"Q. Well, what is your concept of what value, or the mechanism or the device that should be applied to this situation to fix valuation for production tax purposes? A. Under the law, the Board is charged with fixing a fair value on all property, and we think that the fair value on oil is the posted field price whenever it's possible to arrive at such a price, and in the absence of such a price we have to try to arrive at a valuation for taxation purposes that will be uniform, as nearly as possible, over the state on oil as compared to quality and gravity.

"Q. Regardless of what amount the producer or taxpayer finally receives himself? A. That's correct.

"Q. Then it's your position, and I assume you speak for the Board, that if you tax on the basis of $2.81, and, actually, the producer has to pay a trucking charge to obtain that, then he's not entitled to any credit for the trucking charge? A. That's right."

The board's action indicated that this view was accepted by it as did a statement of the chairman at the time of the conclusion of that same hearing:

"When you go into these things too deeply and you try to explore every avenue and try to use every element of value that you can possibly come up with, it would cause an administrative problem that would be difficult to ex-

plain, difficult to set out and difficult to apply to each individual operation.

"In assessing oil properties and the value of oil we have used some basic elements of value, and that, I would say, one of the basic elements is the gravity of the product.

\* \* \* \* \* \*

" \* \* \* I think that industry should not be too meticulous in trying to tear these things down. If they can show us where a better procedure, more practical and that is workable, can be instituted, I am sure that this Board will certainly consider it very definitely."

The inconsistency of defendants' arguments should be noted. At one time they contend that a requirement for the consideration of trucking costs will erode the board's authority, and in a contrary view that this would create administrative problems. Neither of these contentions can be given much weight since the statutes applicable in this case admit of classification and direct the prescribing of a system therefor. This would seem to give the board sufficient leeway to resolve any difficulty.

In the instant situation the general rule that the value of personal property for purposes of taxation should be estimated according to the fair actual cash market value, or the price that the property would sell for in cash in the usual course of business, must be applied.

 We turn then to the question of whether the decisions were fraudulent, arbitrary, illegal, capricious, and a grave abuse of discretion. Defendants cite Deere Manufacturing Company v. Zeiner, 247 Iowa 1364, 78 N.W.2d 527, 535, 79 N.W.2d 403, for the holding that plaintiff has the burden of proving the valuation to have been arbitrary and capricious and that such showing is something more than a mere difference of opinion. This burden was met by the evidence which disclosed that the cost of trucking the product to a place where it could be marketed received no consideration whatever and that the resulting valuation constituted a lack of uniformity and a discrimination between plaintiff and other oil producers. In fact, the Director of the Ad Valorem Tax Department readily admitted that the trucking charge did not enter into the board's computation and conceded that this worked a hardship on certain persons, including the plaintiff, but contended that this was necessary in the interest of uniformity. We think there was a clear showing both of a failure to give weight to a necessary element of value and a resulting discrimination. This is not to say that either the Director of the Ad Valorem Tax Department or the members of the board intentionally disregarded that which they conceived to be important. The record discloses that the members of the board were seriously interested in the problem and were desirous of acting fairly in the light of their interpretation. Accordingly, there was no actual fraud or caprice in the popular sense of the terms. Interrogation of witnesses reflected defendants' awareness of numerous complications which might arise if the board granted plaintiff's request, such as apparent rather than actual demand for the oil at points where posted field prices existed; differences of trucking costs, even within a given field; potential circumstances which might affect arm's length dealings as to selling prices; and the impracticability of readily determining market value without reliance on posted field prices. Although the board's decisions were not censurable from a moral standpoint, they constituted a grave abuse of discretion and were unconstitutional because failure to consider factors, which under any concept were essential to a taxation in proportion to the value of the product, resulted in a discrimination. The record discloses no substantial evidence to support any of the four decisions which were appealed to the district court and under the consolidated procedure there affirmed. The judgment must be reversed with instructions that the board proceed with revalua-

tion of plaintiff's property in conformity with the views expressed in this opinion.

Other bases for reversal of the judgment are presented by plaintiff's counsel, but the arguments are only cursory and no authorities are cited which would warrant a discussion. Miller v. Board of County Commissioners of the County of Natrona, 79 Wyo. 502, 337 P.2d 262, 271; Salt Creek Transp. Co. v. Public Service Commission of Wyoming, 37 Wyo. 488, 263 P. 621, 622.

Reversed.