**TETON VALLEY RANCH and Wendell Wilson, Petitioners,**

v.

**STATE BOARD OF EQUALIZATION, Teton County Board of Equalization, Teton County Assessor, Respondents.**

**No. 86–185.**

Supreme Court of Wyoming.

April 3, 1987.

Ron Arnold of McCartney & Arnold, P.C., Cheyenne, for petitioners.

A.G. McClintock, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., and Robert J. Walters, Asst. Atty. Gen., for respondents.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

This case comes before us on a certification from the district court. We are asked to review an order of the State Board of Equalization which upheld the decision of the Teton County Board of Equalization to modify the assessment of properties known as Teton Valley Ranch Subdivision, including the Sheep Mountain Commercial Subdivision.

We affirm.

Petitioners Teton Valley Ranch and Wendell Wilson present the following issues:

"I. WHETHER THE STATE BOARD OF EQUALIZATION'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE?

"II. WHETHER THE STATE BOARD OF EQUALIZATION'S DECISION WAS RENDERED IN ACCORDANCE WITH LAW?

"A. WHETHER THE STATE BOARD OF EQUALIZATION HAS FAILED TO RECOGNIZE THE DISTINCTION BETWEEN 'UNIFORM AND EQUAL ASSESSMENT' AND 'FAIR VALUE'."

Respondents State Board of Equalization, Teton County Board of Equalization, and Teton County Assessor restate the issues as:

"I. IS THE DECISION OF THE APPELLEE STATE BOARD OF EQUALIZATION SUPPORTED BY SUBSTANTIAL EVIDENCE?

"II. IS THE DECISION OF THE APPELLEE STATE BOARD OF EQUALIZATION ARBITRARY OR CONTRARY TO LAW?

"III. IS THE DECISION OF THE APPELLEE STATE BOARD OF EQUALIZATION CONTRARY TO THE STATUTORY REQUIREMENT THAT PROPERTY BE VALUED AT ITS 'FAIR VALUE' FOR PROPERTY TAX PURPOSES?"

Petitioners are record owners of certain real property located in Teton County, Wyoming, generally known as the Teton Valley Ranch Subdivision, Units I, II, and III and the Sheep Mountain Commercial Subdivision. The United States Fish and Wildlife Service desired to exchange federal land for this property; therefore, four appraisals of the property were performed.

The first two appraisals were completed at the request of the Fish and Wildlife Service. Petitioners were dissatisfied with the results of these appraisals and, feeling that their property was worth more, arranged for the completion of two additional appraisals by other appraisers. The range of values resulting from the four appraisals was from a low of $3,219,090 to a high of $6 million. A so-called "blue ribbon" panel was commissioned to review only the two middle appraisals and to advise which of the two more closely reflected the current market value of petitioners' property.

On December 17, 1984, the panel issued a "STATEMENT OF FINDINGS" indicating that the appraisal of $3,515,000 more closely reflected the current market value of the property. Upon the basis of the "blue ribbon" panel's analysis and final recommendation, the fair market value of $3,515,000 was used in making the land exchange.

The county assessor assessed the subject property for the 1985 tax year at a value of $564,708, which indicated a current market value of $7,058,850. Petitioners filed an appeal of the assessed valuation with the county board pursuant to § 39-2-302, W.S. 1977. On July 16, 1985, the county board issued its decision indicating

> "[t]hat the fair value of the property in question is $6,100,000.00, and that this amount is the sum upon which the tax assessment should be based."

Although this finding was a reduction in the county assessor's value of the property, it was adverse to petitioners. They timely filed a notice of appeal before the state board, and a hearing was held on August 28, 1985. On November 4, 1985, the state board issued an order affirming, for tax purposes, the value of petitioners' property at $6.1 million as set by the county board.

On December 9, 1985, petitioners filed a petition for judicial review in district court. Both petitioners and respondents having requested that the proceeding be certified directly to the Supreme Court pursuant to Rule 12.09, W.R.A.P., the district court entered its order on July 15, 1986, certifying the case to this Court.

In essence, each of petitioners' claims questions the manner in which the state board arrived at its decision. Therefore, we will consider the claims together.

Section 39-2-302 provides in pertinent part:

> "(b) The county board of equalization shall:
>
> *    *    *    *    *    *
>
> "(iv) Hear and determine the complaint of any person relative to any property assessment or value as re-

turned by the county assessor subject to subsection (c) of this section.

> "(c) * * * Any person wishing to contest an assessment of his property shall file a statement under oath with the county board of equalization specifying the reasons why the assessment is incorrect and may appear at either meeting of the board in support of the claim. A county board of equalization may receive evidence relative to any assessment * * *. Minutes of the examination shall be taken and filed with the county clerk."

In accordance with this section, petitioners filed a sworn statement with the county board in which they set forth the facts relating to: (1) the land in question; (2) the appraisals conducted in conjunction with the proposed exchange of that land; and (3) the assessment performed by the county assessor. Petitioners also requested that the county board adopt the finding of the blue ribbon panel that the value of the land for tax purposes was $3,515,000. In addition, petitioners filed copies of the county's assessment and the blue ribbon panel's findings. At the hearing before the county board on June 10, 1985, petitioners presented argument and evidence and agreed to obtain copies of the four initial appraisals for the board members. The county assessor also appeared before the county board and explained that the difference in values between her assessment and the other appraisals occurred because, when a plat is subdivided, she is required by the state board to value each lot separately, whereas the other appraisals were made on the basis of the sale of the overall piece of property. The county board took the matter under advisement and, on July 16, 1985, issued its findings of fact and conclusions of law.

Petitioners appealed to the state board pursuant to § 39-1-304(a), W.S.1977, which provides that "[t]he state board of equalization shall * * * hear appeals from county boards of equalization."

In accordance with Chapter XVII, § 4(a) of the Rules and Regulations of the Wyo-

ming State Tax Commission [1] and § 16–3–107, W.S.1977,[2] a contested case hearing was held before the state board on August 28, 1985. At the hearing, prior to the taking of any testimony or evidence, the respondents requested the board to take judicial notice of the record of the proceedings before the county board. Petitioners made no objection, and the hearing officer granted the request. Thereafter, in the course of the hearing, the following exhibits were introduced and admitted: the four initial appraisals, the blue ribbon panel's report and findings, the county assessor's summary of value zones, maps of the property in question, and a letter from the state board to the county board stating that subdivision lands were being improperly assessed and directing the county board to ensure that assessments of such land be properly made in the future. In addition, the state board heard the testimony of Robert Mitchell, a member of the blue ribbon panel, James Shaw, the individual responsible for arranging for the appraisals and managing the land transaction between petitioners and the Fish and Wildlife Service, and DeAnn Sutton, the assessor for Teton County.

1. Chapter XVII, § 4(a) of the Rules and Regulations of the Wyoming State Tax Commission provides:

    "Section 4. *Definitions.* For the purposes of appeals brought before the Board under these rules, the following definitions shall apply:

    "(a) 'Appeal'—A proceeding before the Board in which the legal rights, duties or privileges of a party are to be determined by the Board after an opportunity for hearing. An appeal is a contested case as that term is defined in W.S. 16–3–107."

2. Section 16–3–107, W.S.1977, provides in pertinent part:

    "(a) In any contested case, all parties shall be afforded an opportunity for hearing after reasonable notice served personally or by mail. * * *

    \* \* \* \* \* \*

    "(c) In all contested cases, depositions and discovery relating thereto, agencies shall have the authority to administer oaths and affirmations, subpoena witnesses and require the production of any books, papers or other documents relevant or material to the inquiry. * * *

    "(d) In all contested cases the agency shall as part of its rules of practice provide that the

In a comprehensive statement of findings of fact and conclusions of law issued November 4, 1985, the state board found in part:

"1. That on or about May 22, 1985, the Teton County Assessor prepared assessment schedules respecting [three] parcels ow[n]ed by Teton Valley Ranch * * *.

"2. That the above-mentioned assessment reflected that the subject parcels were assessed at a value of $245,658.00, $178,978.00, and $117,536.00 respectively as rural subdivision lots.

"3. That the subject parcels were duly platted and approved for subdivision by the Teton County Commissioners in 1976 * * * and in 1977 * * *.

\* \* \* \* \* \*

"5. That [the petitioners] also [own] property in Teton County, known as Sheep Mountain Commercial Subdivision. The county assessor prepared an assessment schedule on this property on or about April 11, 1985 which * * * reflects an assessed valuation of $22,536.00. This property was duly platted and approved for subdivision by the

agency or one (1) of its presiding officers designated by it upon application of any party shall issue a subpoena requiring the appearance of witnesses for the purpose of taking evidence or requiring the production of any books, papers or other documents relevant or material to the inquiry.

\* \* \* \* \* \*

"(g) In all contested cases the taking of depositions and discovery shall be available to the parties in accordance with the provisions of Rules 26, 28 through 37 (excepting Rule[s] 37(b)(1) and 37(b)(2)(D) therefrom) of the Wyoming Rules of Civil Procedure * * *.

\* \* \* \* \* \*

"(j) Opportunity shall be afforded all parties to respond and present evidence and argument on all issues involved. Any person compelled to appear in person before any agency or representative thereof shall be accorded the right to be accompanied, represented and advised by counsel or, if permitted by the agency, by other qualified representative.

"(k) Every party shall be accorded the right to appear in person or by or with counsel or other duly qualified representative in any agency proceeding in accordance with such rules as the agency prescribes and the pertinent rules of the supreme court of Wyoming."

Teton County Commissioners in 1980. * * *

"6. That the subject properties are located in the D–2–1 Value Zone of District 2 in Teton County. * * * The value zones in Teton County stem from a manual created from a reappraisal of Teton County property in 1978 done by a professional appraisal firm. According to the summary of values in the above-mentioned manual, the estimated value per acre is $30,000.00 for lands up to 4 acres; for parcels between 4 and 7 acres, the estimated value for the parcel is $120,000.00; for lands between 7 and 19.5 acres, the estimated value per acre is $17,150.00; and for parcels having between 19.5 to 35 acres, the estimated value for the parcel is $335,000.00. These values apply for the 1985 tax year and were updated by the county assessor for the current tax year.

\* \* \* \* \* \*

"8. That the Petitioners' property known as Teton Valley Ranch Subdivision, as well as the Sheep Mountain Commercia[l] Subdivision, was the subject of several appraisals between 1981 and 1984 for the purposes of a land exchange with the federal government. Specifically, four appraisals were performed on Teton Valley Ranch Subdivision * * * and the Sheep Mountain Commercial Subdivision * * *.

"9. That the four above-mentioned appraisals indicated the following:

"a. The Meiling appraisal concluded that the value of [the] subject properties was $3,079,090.00. * * *

"b. The Johnson appraisal concluded that the value of the subject properties was $3,515,000.00 * * *.

"c. The Moore appraisal concluded that the value of the subject properties was $4,156,000.00. * * *

"d. The Ford appraisal concluded that the value of the subject properties was $6,000,000.00.

"10. That a so-called 'blue ribbon panel' was commissioned on or about November 28, 1984 to review the Johnson and Moore appraisals and advise through a consensus of opinion which of the two more closely reflected current market value.

"11. That the blue ribbon panel in its 'Statement of Findings' dated December 17, 1984 concluded that the Johnson appraisal indicating a value of the subject properties as $3,515,000.00 more closely reflected current market value. * * *

"12. All of the above-stated appraisals utilized a so-called 'development procedure' which is a method to determine value when there are few sales for a market comparison approach or when value indications through sales comparison need substantiation. * * *

"13. That the Teton County Commissioners were instructed on or about October 11, 1979, that subdivision lands did not qualify for assessment as agricultural lands. * * *

"14. That the practice of the Teton County Assessor with respect to subdivision lands was and is to assess a subdivision as an aggregate of the individually assessed lots within the subdivision and that all subdivision lands in Teton County are assessed in this manner.

"15. That the Teton County Board of Equalization received evidence of the four above-mentioned appraisals * * * and * * * issued Findings of Fact and Conclusions of Law * * *.

\* \* \* \* \* \*

"CONCLUSIONS OF LAW

\* \* \* \* \* \*

"3. *That the State Board of Equalization is required* pursuant to W.S. 39–1–304(a)(xii) and (xiii) *to '[D]etermine how lands should be classified for assessment purposes' and '[P]rescribe the system for establishing the fair value of all property valued for property taxation* to ensure that all property is uniformly valued.' In accordance with its statutory duties, the State Board directed all county asses-

sors to assess subdivision lands at 8% of current market value.

"4. That county assessors are required by law to secure data concerning the listing and taxation of property within his or her county and gather data from public records and other sources as will enable him or her to assess all property at its fair value. W.S. 18–3–204(a)(ii).

"5. That there is a formally filed subdivision plat relating to the subject properties.

"6. That at the time of assessment, the subject properties were properly classified and carried on the assessment [rolls] as rural subdivision lots.

"7. *That the Teton County Assessor assessed the subject properties in accordance with State Board of Equalization directives and there was no evidence to indicate that such properties were assessed in a manner inconsistent or contrary to State Board directives or in a non-uniform manner.*

"8. That the appraisals prepared by four certified appraisers were provided for the purposes of determining the fair market value of the subject properties contemplated a change in use of the subject properties. Although each appraisal reflected the use of recognized appraisal techniques, the disparity of conclusions of value indicated by each appraisal also reflect[s] that a variety of characteristics or factors influenced each appraiser in different degrees.

"9. That the appraisals for the proposed land exchange between Petitioners and the federal government apply to a sale of the entire parcel and not as individual subdivision lots.

"10. That the Teton County Board of Equalization decision to reduce the fair market value of the subject properties was proper inasmuch as the record indicates that the reduction was to correct the valuation of those properties to be consistent with the value of comparable property in the same value zone. It is not apparent from the record what weight, if any, was given to any or each of the four appraisals, although it appears that the Ford appraisal may have been given the most weight.

"11. That the Teton County Board of Equalization properly adjusted the value of the subject property for lack of subdivision improvements.

"12. That Petitioners have the burden of proof to demonstrate that the subject properties were assessed incorrectly, erroneously or in an otherwise unlawful manner.

"a. The mere showing that a different conclusion as to the fair market value of the properties should have been reached without evidence that the County Assessor or county board of equalization did not perform their duties imposed by law or otherwise in accordance with directives by the State Board of Equalization respecting assessment of property for property tax purposes or that those directives were incorrectly applied is insufficient.

"b. The record of the proceedings before the county board of equalization reflects that the county assessor and the county board considered the appraisals offered by Petitioner in support of the properties' fair market value.

"c. The presumption [is] that the county assessor and the county board of equalization exercised honest judgment in determining the fair value of property for property tax purposes." (Emphasis added.)

As the preceding discussion clearly demonstrates, petitioners have twice been afforded the opportunity to present their complaint at a trial-type hearing. On neither occasion does the record indicate that the evidence presented was not fully and fairly considered. Yet petitioners complain that the state board's findings are not supported by the evidence or somehow are contrary to law.

When reviewing an agency decision:

"We examine the entire record to determine if there is substantial evidence to support an agency's findings, and if there is, we will not substitute our judgment for that of the agency. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it may be less than the weight of the evidence but cannot be contrary to the overwhelming weight of the evidence." *Wyoming Insurance Department v. Avemco Insurance Company*, Wyo., 726 P.2d 507, 509 (1986) (citation omitted).

In addition:

"If substantial evidence supports a finding, the agency, in light of the expertise and experience of its members, appropriately determines the ultimate weight assigned to such evidence." *Gulf Oil Corporation v. Wyoming Oil and Gas Conservation Commission*, Wyo., 693 P.2d 227, 239 (1985).

In the present case, the state board had before it evidence of five widely divergent assessments of the value of the property. The state board also had before it evidence of the methods used and factors considered by the four appraisers and the county assessor in making their assessments. The county assessor testified that in 1977 the assessor's office hired a professional appraisal firm to conduct an assessment of all lands within Teton County. She testified further that the assessment was conducted in accordance with the directive of the state board that all lots, town lots, subdivisions and suburban lands be assessed at current market value. The county assessor also testified that, on the basis of this assessment, all lands in Teton County were then placed in value zones. Finally, she testified that the values assessed for each zone by the professional appraisal firm were later updated by her office for the 1985 tax year on the basis of current comparable sales on vacant lots within the particular value zone or, if there were no comparable sales, on the basis of general sales informa-

tion from licensed real estate agents or appraisers in Teton County. While petitioners offered evidence of their appraisers' superior expertise, experience, and technique, they offered no evidence that the county assessor failed to assess the property in a manner consistent with the directives of the state board. Petitioners' claim that the state board made no finding that the $6.1 million assessment was a fair value in accordance with § 39–2–102, W.S. 1977,[3] is without merit. As indicated in the findings of fact and conclusions of law quoted above, the state board acknowledged its duty to prescribe the system for establishing fair value and concluded that the assessor for Teton County assessed the property in question in accordance with that system. Thus, the state board concluded that the property was assessed in accordance with § 39–2–102 and its own rules and regulations.

Petitioners claim that the state board failed to recognize fair value independently of uniform and equal assessment is also without merit. That the county assessor testified she applied her valuation approach to all properties uniformly does not mean she failed to arrive at a fair value. As indicated previously, the state board expressly stated in its conclusions of law that it is required to prescribe the system for establishing fair value and that the county assessor's valuation was in accordance with that system.

In a proceeding of this nature, the burden of proof is upon the party asserting an improper valuation. *Weaver v. State Board of Equalization*, Wyo., 511 P.2d 97 (1973); *Scott Realty Company v. State Board of Equalization*, Wyo., 395 P.2d 289 (1964); *Bunten v. Rock Springs Grazing Association*, 29 Wyo. 461, 215 P. 244 (1923). Petitioners have failed to meet this burden.

For all of the reasons stated above, we find that substantial evidence exists to support the state board's findings and that sufficient information was before the state

---

**3.** Section 39–2–102, W.S.1977, provides:
"All taxable property shall be valued at a fair value in conformity with the values and pro-

cedures prescribed by the board as provided by this act."

board to preclude a finding that the state board's decision is arbitrary and contrary to law.

URBIGKIT, J., filed a concurring opinion.

URBIGKIT, Justice, concurring.

Value in empirical terms is an intangible product of time and place: willing seller—available buyer. Without buyer, there is no marketable value. 1 Bonbright, Valuation of Property (1st ed.) at 59.[1] Any statistical comparison of Wyoming real estate time-distinguished values between 1982 and the present would reveal a market decrease which may total 50 percent overall. The specificity of economics cannot be mathematically converted into taxation assessment standards, Bonbright, supra, Ch. XVIII, Valuation for Tax Purposes: The General Property Tax, and is not within the uniformity, equality and fairness criteria of Art. 15, § 11, and Art. 1, § 28 of the Wyoming Constitution:

"All property, except as in this constitution otherwise provided, shall be uniformly assessed for taxation, and the legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal." Article 15, § 11, Wyoming Constitution.

"No tax shall be imposed without the consent of the people or their authorized representatives. All taxation shall be equal and uniform." Article 1, § 28, Wyoming Constitution.

I specially concur to address the particularized issue presented by appellant that the State, in failing to acknowledge the absorption factor in standard appraisal criteria, consequently fails to conform the assessment to the Wyoming Constitution, or Ch. 9, § 4 of the Wyoming Tax Commission's rules and regulations, as well as the controlling statute, § 39–2–102, W.S.1977.

If value as a definable term is a price to be paid upon sale between a willing seller and a willing (available) buyer, see *CF & I Steel Corporation v. State Board of Equalization*, Wyo., 492 P.2d 529, 533 (1972), then absorption is a relevant issue for review. See generally Bonbright, supra, Ch. III.

"In legal valuations, the most serious problems as to the use of sales as evidence of value occur in those cases where the objecting party to the dispute can present a forceful argument * * * that the sales were not in the quantities that would be involved in a sale of the existing property * * *.

"All of these types of objection are plausible and their force will be recognized by the appraisal profession. But their application in a given case cannot be determined by formulas * * * and the courts have wisely refused to lay down any but the most general rules on these issues." Bonbright, supra, at 137.

Absorption (discount sellout), see *Golder v. Department of Revenue*, 123 Ariz. 260, 599 P.2d 216 (1979), and the counterpoint aggregation (sometimes called plottage), are in the essence of the criteria of the willing and omnipresent "available" buyer. See rejection of discount sellout as a requirement for tax assessment, *Palm Beach Development and Sales Corp. v. Walker*,

---

1. "A current definition of market value is *The most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.*
"Fundamental assumptions and conditions presumed in this definition are
"1. Buyer and seller are motivated by self-interest.
"2. Buyer and seller are well informed and are acting prudently.

"3. The property is exposed for a reasonable time on the open market.
"4. Payment is made in cash, its equivalent, or in specified financing terms.
"5. Specified financing, if any, may be the financing actually in place or on terms generally available for the property type in its locale on the effective appraisal date.
"6. The effect, if any, on the amount of market value of atypical financing, services, or fees shall be clearly and precisely revealed in the appraisal report." M.A.I., The Appraisal of Real Estate (8th ed. 1983) at 33.

478 So.2d 1122 (1985). See also discussion of the inefficient market concept of real estate valuation, M.A.I., The Appraisal of Real Estate (8th ed. 1983), at 62.

Axiomatic factors for appraisal decision in the law merchant or comparable judicial proceedings such as eminent domain cannot equivalently be transferred to constitutional criteria of assessment for taxation.

"Common to the legal appraisals treated in the four previous chapters is an objective which sets the starting point for an inquiry as to the definition and measurement of property value—the objective of indemnity. What the property is 'worth' must there be determined in the light of the purpose of the lawsuit, which is to fix a cash payment that will recompense the owner, in whole or in part, for the loss of his valued possession.

"When we turn to the valuations for tax purposes, a different situation is presented. No longer is the owner claiming a recompense for the loss of his property; on the contrary, he is being compelled to contribute to the government treasury, in an amount which, for some reason, is measured by an appraisal of his wealth, or of a specific portion of his wealth. The very meaning of 'value of the property,' no less than the practical technique of its measurement, now becomes dependent on issues that fall within the province of fiscal theory and tax administration.

"In canvassing the literature of public finance, one looks in vain for any master principle of tax apportionment which can take the place of the indemnity principle under the laws of damages and eminent domain, as the chief clue to the proper meaning of 'value.' " Bonbright, supra, at 451.

The specific question presented is whether the local assessor by a process approved through action of the State Board of Equalization, can legally and constitutionally apply a unit price to multiple units in disregard of economic principles that may at the specific time control actual value, namely absorption in available market. See 1 Orgel on Valuation Under Eminent Domain, Ch. XIII, Assessed Valuations and Other Official Valuations as Evidence of Market Value (2d ed. 1953) at 629; and 5 Nichols on Eminent Domain, Ch. 22 (Rev. 3d ed.) at 22–1.

Value—assessment—taxation, has been addressed by this court in nine cases: *Wyoming Board of Equalization v. State ex rel. Basin Electric Power Cooperative*, Wyo., 637 P.2d 248 (1981); *Hillard v. Big Horn Coal Co.*, Wyo., 549 P.2d 293 (1976); *Weaver v. State Bd. of Equalization*, Wyo., 511 P.2d 97 (1973); *CF & I Steel Corporation v. State Board of Equalization*, supra; *Chicago, Burlington & Quincy R. Co. v. Bruch*, Wyo., 400 P.2d 494 (1965); *Scott Realty Company v. State Board of Equalization*, Wyo., 395 P.2d 289 (1964); *J. Ray McDermott & Co., Inc. v. Hudson*, Wyo., 370 P.2d 364 (1962); *State ex rel. Greenwood v. Pearson*, 46 Wyo. 307, 26 P.2d 641 (1933); and *Bunten v. Rock Springs Grazing Association*, 29 Wyo. 461, 215 P. 244 (1923).

In those cases, this court has consistently required only a rational method, equally applied to all property, which results in essential fairness. County assessors and the taxation system are not required to annually duplicate sales-transaction transient market conditions, and specifically so in regard to defining events related to the individual taxpayer, such as absorption or prospective future value. See Annot., 24 A.L.R. 649; *Finch v. Grays Harbor*, 121 Wash. 486, 209 833, 24 A.L.R. 644 (1922).

I specifically concur to make clear that in no way may mandates of the Constitution, Art. 1, § 28, and Art. 15, § 11 be subverted in the property assessment and taxation process. *Sparks v. McCluskey*, Ariz., 84 Ariz. 283, 327 P.2d 295 (1958); [2] *Appeal of Farmers*, 80 Idaho 72, 325 P.2d 278 (1958); *Gerner v. State Tax Commission*, 71 N.M. 385, 378 P.2d 619 (1963); *City of Arlington v. Cannon*, Tex.Civ.App., 263 S.W.2d 299

---

**2.** A detailed analysis and critique of the Arizona general property assessment system under the Arizona differentiated class valuation system is found in Handy, *Valuation and Taxation of Residential Real Property in Arizona*, 1985 Ariz.

State L.J. 145 (1985). See also a different critique of Kansas property tax, Note, *Kansas Property Tax: Mischievous, Misunderstood, and Mismanaged*, 22 Washburn L.J. 318 (1982).

(1953), rev'd in part on other grounds 153 Tex. 566, 271 S.W.2d 414 (1954); *Finch v. Grays Harbor,* supra. However, that requirement would not impose on the system an unmanageable burden as would result from the application of the differentiated market factor for which appellant contends.

The uniformly computed and fairly applied appraisal methodology here in evidence, described in the testimony of the county assessor, can be sustained under the standards of our precedent. *Bunten v. Rock Springs Grazing Association,* supra. See also *In re Protest of Taxpayers of Town of Nichols Hills,* 198 Okl. 500, 180 P.2d 157 (1947); *City and County of Denver v. Lewin,* 106 Colo. 331, 105 P.2d 854 (1940); and *Twentieth Century Investment Company v. City of Juneau,* Alaska, 359 P.2d 783 (1961).

In *Bunten,* supra, the principal Wyoming case, this court said:

"There is no such thing as absolute value * * *. [O]ne man may give a different valuation to a piece of land than another * * *." 215 P.2d at 248,

and:

" * * * [P]laintiff had the right [pursuant to the Wyoming Constitution, Art. 15, § 11] to have all the taxable property in the county, as well as in the state, assessed at a uniform rate, and a departure therefrom if made in an illegal manner is, where its property is assessed at full value, a discrimination against it which would not only be a fraud against plaintiff but would also violate the constitutional provision of uniformity. Such discrimination may arise in various ways, for instance by the adoption of a wrong or illegal rule, principle, or method; and an unjust tax resulting therefrom has frequently been enjoined as illegal." 215 P.2d at 251.

I concur in this case on the basis that appellant failed to demonstrate that the assessor's rejection of absorption factoring in multiple-lot valuation was a constitutionally unacceptable tax-assessment method.