In the Matter of the Appeal of PARADISE VALLEY COUNTRY CLUB from the State Board of Equalization 1983, 1984, and 1985 Tax Assessments.

**PARADISE VALLEY COUNTRY CLUB, Appellant (Petitioner),**

v.

**WYOMING STATE BOARD OF EQUALIZATION, Appellee (Respondent).**

No. 87-79.

Supreme Court of Wyoming.

Jan. 11, 1988.

Jeffrey C. Gosman, Casper, for appellant.

---

Joseph B. Meyer, Atty. Gen., Peter J. Mulvaney, Deputy Atty. Gen., Robert J. Walters, Asst. Atty. Gen., for appellee.

Before BROWN, C.J., and THOMAS, CARDINE, URBIGKIT and MACY, JJ.

URBIGKIT, Justice.

We are presented with a real estate tax reassessment for a private golf club raising issues of the process used, the amount of increase of 2200 percent, and the denial of any protest hearing. Equality and fairness issues of a constitutional perspective were included in the various challenges made to the reassessment and tax increase. We remand on a procedural basis for the taxpayer to be provided a hearing.

### ISSUES PRESENTED

1. Reassessment without notice violates due process under Art. 1, § 6, Wyoming Constitution and the Fourteenth Amendment to the United States Constitution—constitutional issue.

2. Illegality of the tax assessed and levied for 1984 in process and application—statutory and procedural issue.

3. The district court, in denial decision following administrative agency appeal from the state board of equalization, rejected the tax challenge as insufficiently documented in initial protest petition—form of the protest issue.

We will avoid direct consideration of Issue 1 by reversing and remanding for a hearing on Issue 2, and will summarily dispose of Issue 3.

### FACTS

In 1983, Paradise Valley Golf and Country Club, Inc. (Paradise Valley) paid $4,738 in ad valorem taxes for the club property, based on an adjusted tax base valuation of $58,315. A similar assessment level was continued for the 1984 year, until in August, by reassessment, the base value before real-property tax-ratio allocation was increased from $271,583 to $3,394,787. At the same time, no similar assessment increase was made for the neighboring Casper Country Club golf course properties. As well as general invalidity, appellant Paradise Valley contended that the taxation differential between the two clubs was ten times, or about 1000 percent, although the intrinsic real estate value of the Casper Country Club properties was likely higher than that of appellant taxpayer.[1]

The discriminatory feature of the tax assessment is not really in doubt on this record, but rather it is the procedure which circumscribes our review. The result actually arose from the county assessor's reassessment use of a commercial square-footage appraisal for the Paradise Valley golf grounds, as compared to an agricultural land basis for the comparable properties of the Casper Country Club.

In contesting the evidentiary status of the tax bills, the State presented no record or documentation showing a regularly used system either at the county hearing or in the state tax commission proceedings, except that after the conclusion of the state proceedings there was a late-filed affidavit of the county assessor. This instrument furnished no facts, justification, or cogent reasoning for the discrimination between the Casper Country Club and Paradise Valley, or for assessing a golf course on a square-footage valuation basis. See *Teton Valley Ranch v. State Board of Equalization*, Wyo., 735 P.2d 107 (1987).[2]

---

1. In understatement, the State asserts:

    "The record does not reflect any facts which establish any defect in the timing of the assessment notice which Appellant received indicating increase in assessed valuation. Nor does the record indicate that such defect, if any, had the effect of preserving Appellant's entitlement to challenge its 1984 assessment in the 1985 tax year."

    Actually, no statutory authority for the Fall reassessment was discussed in appellee's brief.

2. " * * * [I]n no way may mandates of the Constitution, Art. 1, § 28, and Art. 15, § 11 be subverted in the property assessment and taxation process. *Sparks v. McCluskey*, Ariz., 84 Ariz. 283, 327 P.2d 295 (1958); *Appeal of Farmer*, 80 Idaho 72, 325 P.2d 278 (1958); *Gerner v. State Tax Commission*, 71 N.M. 385, 378 P.2d 619 (1963); *City of Arlington v. Cannon*, Tex.Civ.App., 263 S.W.2d 299 (1953), rev'd in part on other grounds 153 Tex. 566, 271 S.W.2d 414 (1954) * * *." 735 P.2d at 115–116, Urbigkit, J., concurring.

The regular assessment initially certified for the tax rolls in 1984 was about the same as for 1983. In August, the property was reassessed, and notice of the reassessment and increased tax was first received by an amended tax bill dated October 23, 1984.

Assessment for 1985 was similar in amount to the 1984 revised value, and by notice of appeal filed May 16, 1985, Paradise Valley protested the increased assessments for both the 1984 and 1985 tax years. Taken first to the Natrona County Commissioners as ex officio county board of equalization pursuant to § 39–2–302, W.S.1977, the protests to the increased assessments were summarily denied (although somewhat reduced) on June 10, 1985, by board action as reflected by the minutes:

"Jeffrey Gosman was present to protest the 1984–85 tax assessment notice for Paradise Valley Golf and Country Club, Inc. Mr. Gosman represented Mr. Deal Hembree, President of Paradise Valley Golf and Country Club.

"Mr. Gosman stated the tax assessment is inordinately high, and cannot be supported upon any rational formula representing the fair value of the property being taxed. He pointed to the fact the State Board requires that all taxation be uniform and equal in application. Casper Country Club has 40 acres more land, much of which is prime development real estate. The Paradise Valley Golf and Country Club is land-locked and cannot realistically be used for any other purpose than a golf course.

"Mr. Gosman requested to be taxed at the same rate of increase experienced by the Casper Country Club or upon some other basis whereby the actual value of the property is more realistically assessed.

"Assessor Maria Boling stated the property was designated commercial property. The course in Paradise Valley is platted land. Assessor Boling requested

an appraisal of the property or a breakdown of square footage that the building, and parking lot comprise. This property could be assessed as commercial 5 [cents] per square foot, and remaining property 2 [cents] or 3 [cents] per square foot noncommercial rate.

"It was moved by Commissioner Schulte, seconded by Commissioner Ellis to assess the Paradise Valley Golf and Country Club building site and surrounding footage as commercial at five [cents] per square foot, and the remaining land at noncommercial rate 2 [cents] or 3 [cents] per square foot as recommended by Assessor Boling. Motion carried."

By assessing the Paradise Valley golf course land as "commercial" or "platted," the property was initially valued at about 100 times higher than the neighboring golf course as then reduced to only 40 or 60 times higher by the county board of equalization correction.[3]

An appeal pursuant to § 39–1–304(a)(xiv), W.S.1977 was taken to the state board of equalization on June 25, 1985, asserting technical violations in denial of an open-meeting decision, tax-process violation of statutory and constitutional rights, and basic invalidity of the tax increase. The state board hearing was held November 14, 1985, in regular form, with testimony including the minimal record from the county board session. On June 3, 1986, the commission reversed the assessed amount for 1985, and by order provided:

"1. That for the 1985 tax assessment only, the Natrona County Assessor classify and value the subject property in the same manner as was done to the Casper Country Club; and

"2. That the Natrona County Assessor forward such information to the Natrona County Treasurer for correction,"

but provided by the conclusions of law:

"6. Although the Natrona County Board agreed to hear objections to the assessed value of the subject property corresponding to the 1984 and 1985 tax

---

**3.** The nondefinitive two or three cents was probably not in itself a valid tax readjustment action in leaving the assessor a 50 percent discretion

by reduction from five cents to either two or three cents, at her choice.

years, such board acted outside of the scope of its authority respecting the 1984 assessment. Petitioner had an unqualified right to object to its 1984 assessment pursuant to W.S. 34–2–301. However, Petitioner did not object to such value in the then current tax year and waived any right to objection of the 1984 assessed value. As a result, only adjustments to the 1985 assessed value may be ordered."

The taxpayer filed a petition for review in the district court requesting relief for the 1984 increased tax bill, with a further petition for leave to present additional evidence. It was argued that waiver had not been raised at the state board hearing but only first surfaced in the decision.

After judicial appeal submission, the trial court ruled:

"3. Complaints of assessments must be brought within the times prescribed by W.S. 39–2–302, which contemplates that such complaints be *filed with the county board of equalization before their final meeting of the year on the second Monday in June. Times for filing appeals are jurisdictional and cannot be waived.* Therefore, the county board had no jurisdiction to consider an objection filed in 1985 of a 1984 assessment.

"4. The objection filed by the Petitioner before the county board is and was also defective in the following respects:

"a. The notice is signed on behalf of the Petitioner, which has been identified as a corporation, by its president con-

trary to the requirement that attorneys must represent corporations; and

"b. The objection was not made in the form of a statement under oath, contrary to W.S. 39–2–302." (Emphasis added.)

In result, the taxpayer was required to do something to protest action that has not yet happened.[4] A strange divergence then develops in present argument as the taxpayer and the State respond to board and trial-court decisions. It is apparently the position of Paradise Valley that the assessment in amount *was improper*, and that consequent statutory or constitutional right to protest must be given. The State argues to the contrary that the incurred tax might be illegal since the reassessment process was in question but that any contest right passed on December 31, 1984. No authenticating statute was cited for those conclusions. Consequently, the State addressed an illegal tax as waived by inaction before the end of the year, but denied both an improper assessment or right of the taxpayer to protest where the statutory reassessment occurred after the protest period had passed.

## STATUTORY PROVISIONS FOR AD VALOREM TAX SCHEDULE

In order to analyze and distinguish the different litigative conceptions, it is necessary to address the statutory process in Wyoming tax law.

1. Section 39–2–301, W.S.1977.[5] Subsection (a): board of county commissioners

---

**4.** The United States Supreme Court, in *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556, reh. denied 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972), defined:

"For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' *Baldwin v. Hale,* 1 Wall. 223, 233, 17 L.Ed. 531. See *Windsor v. McVeigh,* 93 U.S. [3 Otto] 274, 23 L.Ed. 914; *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215; *Grannis v. Ordean,* 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363. It is equally fundamental that the right to notice and an opportunity to be heard 'must be granted at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo,*

380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62."

See also *Palazzi v. Estate of Gardner,* 32 Ohio St.3d 169, 512 N.E.2d 971, 974 (1987).

**5.** "(a) Each board of county commissioners during its first meeting in January may annually divide the county into assessment districts. * * *

"(b) Annually, on January 31, each board of county commissioners shall furnish suitable assessment rolls and schedules properly ruled and headed to the county assessor upon which shall be entered the legal description of taxable real property, an enumeration of taxable personal property and the name of the person to whom the property is taxable.

"(c) Except as provided by W.S. 39–2–201, annually, commencing on the first Monday in February, the county assessor or deputy asses-

in its first meeting in January divides the county into assessment districts;

2. subsection (b): furnishes assessment rolls and tax schedules to the county assessor January 31;

3. subsection (c): county assessor obtains assessment statement from the taxpayer, commencing on the first Monday in February; and

4. subsection (e): returns the assessment roll enumerating assessed property and stating the value, on or before the fourth Monday in May.

5. Section 39–2–302, W.S.1977.[6] Subsection (a): board of county commissioners as then constituting the county board of equalization meets at the office of the county assessor commencing on the fourth Tuesday in May and the second Monday in June to:

(a) subsection (b)(i): add to the assessment roll and value any taxable property within the county not included within the assessment roll;

(b) subsection (b)(ii): equalize the assessment and valuation of taxable property;

(c) subsection (b)(iii): correct any assessment and complete the assessment roll;

(d) subsection (b)(iv): hear and determine the complaint of any person relative to any property assessment or value as returned by the county assessor subject to the following:

sors as provided by subsection (a) of this section shall obtain from each property owner or person having control of taxable property in the assessment district for which they were appointed, a full, complete and detailed statement of the amount of the taxable property owned by or subject to the control of the property owner. The county assessor or his deputies or any representative of the state board of equalization may examine any property. The county assessor or his deputies shall enter the fair value for taxation on the assessment roll. * * *

\* \* \* \* \* \*

"(e) The county assessor shall enter in books furnished for that purpose, from the tax schedule, the enumeration and fair value of all taxable property assessed by him or his deputies. The county assessor shall enter the names of persons against whom property is assessed in the county assessment roll in alphabetical order. On or before the fourth Monday in May the county assessor shall return the county assessment roll enumerating the property and value assessed by him or his deputies to the board of county commissioners together with a list stating the value of taxable property within each school district, municipality, or special district in the county." Section 39–2–301, W.S.1977.

6. "(a) The board of county commissioners of each county constitutes the county board of equalization. The county board shall meet at the office of the county assessor commencing on the fourth Tuesday in May for not exceeding seven (7) days and on the second Monday in June for not exceeding six (6) consecutive days. The county assessor shall act as clerk, attend all meetings and advise the county board.

"(b) The county board of equalization shall:

"(i) Add to the assessment roll and value any taxable property within the county not included within the assessment roll as returned by the county assessor at its meeting in May;

"(ii) Equalize the assessment and valuation of the taxable property which is assessed and valued by the county assessor;

"(iii) Correct any assessment or valuation contained in and complete the assessment roll;

"(iv) Hear and determine the complaint of any person relative to any property assessment or value as returned by the county assessor subject to subsection (c) of this section.

"(c) The county assessor shall notify any person whose property assessment has been increased by the county board of equalization of the increase. Any person wishing to contest an assessment of his property shall file a statement under oath with the county board of equalization specifying the reasons why the assessment is incorrect and may appear at either meeting of the board in support of the claim. A county board of equalization may receive evidence relative to any assessment and may require the person assessed or his agent or attorney to appear before it, be examined and produce any documents relating to the assessment. No adjustment in an assessment shall be granted to or on behalf of any person who willfully neglects or refuses to attend a meeting of a county board of equalization and be examined or answer any material question upon the board's request. Minutes of the examination shall be taken and filed with the county clerk.

"(d) Immediately after the assessment roll is corrected by the county board of equalization and not later than the first Monday in July, the county assessor shall make an abstract of the assessment roll containing the quantity and value of each class of property assessed for taxation and transmit the abstract to the board." Section 39–2–302, W.S.1977.

6. subsection (c): county assessor required to notify any person whose property assessment has been increased by the county board of equalization of the increase; and

7. any person wishing to contest an assessment of his property shall file a statement with the county board of equalization specifying the reason why the assessment is incorrect and may appear at either meeting of the board in support of the claim;

8. subsection (d): county assessor makes an abstract of the assessment roll; demonstration of the corrections; transmission to the board not later than the first Monday in July.

9. Section 39-2-403, W.S.1977.[7] Board of county commissioners levies taxes as determined by the requisite mill levies furnished by the various taxing entities on or before the first Monday in August.

10. Section 39-1-304(a)(v), W.S.1977.[8] State board of equalization shall require each county assessor immediately after the county boards of equalization have notified the state board of equalization of the amount of county values and state levy to certify to the state board of equalization on or before August 10 all valuations and levies fixed in the respective counties.

11. Section 39-2-403.[9]

(a) Subsection (a): on or before the third Monday in August the county assessor shall compute all taxes from the valuations as corrected by the state board and entered by the county assessor and deliver the tax list and its warrant for collection of the taxes to the county treasurer, setting forth the assessment roll with the taxes extended; after which

(b) subsection (b): county treasurer shall proceed to collect the taxes;

12. subsection (c) county assessor may authorize change in the assessment roll or tax list at any time to correct errors in the name of the person taxed or to enter omitted property and its assessed value.

In this case, apparently as a general activity but specifically as to Paradise Valley, a reassessment was made in August 1984, resulting in an amended tax bill received by the taxpayer in October.

## NOTICE REQUIREMENT

This litigation is consequently defined as a question of a reassessment that occurred after the right to protest had passed for the tax year.

Although not clearly perceived by the litigants, nothing of record indicates that *notice of the reassessment* was ever given to the taxpayer, but rather the original tax

7. "(a) On or before the first Monday of August, the board of county commissioners shall by order entered of record levy the requisite taxes for the year. On or before the third Monday in August the county assessor shall compute the taxes from the corrected valuations as corrected by the state board and entered by the county assessor in the column of corrected valuations. The county assessor shall deliver the tax list and his warrant for the collection of the taxes to the county treasurer * * *.

"(b) The county treasurer upon receiving the tax list and warrant shall immediately proceed to collect the taxes levied for the current year and taxes remaining unpaid from preceding years. * * *

"(c) The county assessor may authorize changes in the assessment roll or tax list at any time to correct errors in the name of a person taxed or to enter omitted property and its assessed value. Property omitted from prior year tax lists discovered by the county assessor shall be added to the assessment roll and taxes computed and collected for the period the property was omitted not exceeding five (5) prior years or since the last change in ownership, whichever is less." Section 39-2-403, W.S.1977.

8. "(a) The state board of equalization shall perform the duties specified in article 15, section 10 of the Wyoming constitution and shall hear appeals from county boards of equalization, review state excise taxes and review their own assessments of property and tax determinations. In addition, the board shall:

"* * * * * *

"(v) Require each county assessor immediately after the county boards of equalization have been notified by the state board of equalization of the amount of the county values and state levy, to certify to the state board of equalization, on or before August 10 of each year, in the form and detail prescribed by the board, all valuations and levies fixed in their respective counties;" Section 39-1-304(a)(v), W.S.1977.

9. Supra n. 7.

bill for 1984, No. 69159082, reflected a tax of $4,789.09, and a corrected tax bill, Supplement 42864 dated October 23, 1984, showed the increased tax of $20,845.69 computed from the increase of real estate adjusted assessment value from $13,400 to $258,183. On issue of notice, see *Mennonite Board of Missions, Inc. v. Adams*, 462 U.S. 791, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983); and *Covey v. Town of Somers*, 351 U.S. 141, 76 S.Ct. 724, 100 L.Ed. 1021 (1956).

■ The substantive invalidity of the amended tax assessment amount was discerned by the state board in conclusion, with which we concur by review of the unquestioned evidence:

"5. That Petitioner has the burden of proof to demonstrate that the subject properties were assessed incorrectly, erroneously or in an otherwise unlawful manner. Petitioner has satisfied such burden of proof to the extent that there is no apparent reasonable basis for applying different land classification and valuation for the two country clubs under the facts of this case. Because different classification and valuation methodology was applied to the subject property from the Casper Country Club, the valuation is considered to have been made in a non-uniform manner; and the subject matter should be valued in the same manner as the Casper Country Club." [10]

## PROTEST RIGHT TO REAL PROPERTY REASSESSMENT

■ In a factual context, absent constitutional inquiry, it would seem that three possibilities exist to afford taxpayer hearing as contemplated by the statutes. Unfortunately, the legislature has afforded little direction for a consideration of legislative intent. See *Burlington Northern*

*R.R. Co. v. Oklahoma Tax Commission*, —— U.S. ——, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987) on the applicable problem of assessment amount.

The first choice would be to deny right of reassessment unless occurring within the time when the protest period for the same tax year could be activated; in other words, before the June meeting of the county board of equalization. This would mean that no reassessment could occur after the initial roll certification had been completed in April. Denial of flexibility to cure mistakes despite specific statutory reassessment provisions lacks persuasion for adoption of this choice as defining apparent legislative intent. This would invalidate all reassessed actions at least for that current year if made after the June protest time. *Orcutt v. Crawford*, 85 F.2d 146 (10th Cir.1936).

The second choice is to implement an additional protest hearing process without statutory justification or scheduling so that the county board of equalization procedure scheduled in May and June could be rescheduled by the board to occur later in the year in order to accommodate any interim reassessment. No statutory justification for the arrangement or provision for scheduling and notice requirements are found which could afford evidence of favorable legislative intent for this alternative. To utilize this choice, judicial creation of a process not statutorily provided would be required. Even so, selection of this choice could not provide a solution here, since no such session was noticed, scheduled, or held. Cf. *McGregor v. Hogan*, 263 U.S. 234, 44 S.Ct. 50, 68 L.Ed. 282 (1923).

The final choice is to permit the assessment amount to be protested at the next statutorily provided session to allow both years in issue to be considered. This was the arrangement attempted by Paradise

---

**10.** One thing not explained is why the county assessor had a heightened disaffinity for the taxpayer as compared to its neighboring competitor, the Casper Country Club. Comparable assessments for various golf courses considered in hearing evidence included Paradise Valley, .05 per square foot, reduced by the county board to either 2 or 3 cents, whichever it may have been, without record determination as to whether the county assessor ever actually reduced the assessment in accord with the county board directive before the reversal for 1985 was mandated by the state board; Casper Country Club, .0047; Gillette, .0045; Sheridan, .0024; Laramie, .0008; Old Baldy in Saratoga, .0009; Westover in Gillette, .0002.

Valley and now adopted by this court until such time as the legislature may choose another arrangement which alternatively would afford due-process rights in the taxation system. *Londoner v. City & County of Denver,* 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908).

This court specifically declines in this case to address the constitutional problems which might be created if no right to hearing or protest is made available when late-year assessment occurs. Likewise, we decline to determine that Natrona County reassessments in 1984 were procedurally invalid as consequently creating a general level of illegal taxation for all properties covered in that extensive reassessment program.

This decision assumes validity of the reassessment process, but affords relief to the taxpayer by a right to a hearing if the reassessment value is contested. *Horton v. Driskell,* 13 Wyo. 66, 77 P. 354 (1904). The Wyoming ad valorem statutes as inherited from an agrarian society and essentially unchanged for a century, see Title 43, Revised Statutes of Wyoming 1887, and Title XII, Revised Statutes of Wyoming 1899, deserve legislative attention for schedule and process in order to provide a Twenty–First Century system from initial assessment through levy and collection. See *The General Property Tax in Wyoming—A Symposium,* 4 Wyo.L.J. 225 (1950).

The basic principle of Wyoming law was initially stated in *Hecht v. Boughton,* 2 Wyo. 385, 403 (1881), "constitutional law forbids the levying of a tax before the owners had an opportunity to object to the assessment," and *Bass v. City of Casper,* 28 Wyo. 387, 205 P. 1008, reh. denied 28 Wyo. 387, 208 P. 439 (1922). The principle remains undisturbed, although generally attenuated by an adjunct development that the notice requirement relative to increasing the assessment of a single taxpayer may not apply when the increase was made for the property of a substantial number of taxpayers. *Baker v. Paxton,* 29 Wyo. 500, 215 P. 257 (1923); *Bunten v. Rock Springs Grazing Association,* 29 Wyo. 461, 215 P. 244 (1923); *Carton v. Board of County Commissioners of Uinta County,* 10 Wyo. 416, 69 P. 1013 (1902). Cf. *Corthell v. Board of County Commissioners of Albany County,* 44 Wyo. 71, 8 P.2d 812 (1932); 4 Wyo.L.J. at 230, supra. The definitive statement of this court on the refund of an erroneous or illegally collected tax is found in *Atlantic Richfield Company v. Board of County Commissioners, Sweetwater County,* Wyo., 569 P.2d 1267 (1977).[11]

In reasoning that the taxpayer cannot protest before the action is taken or the decision made, and that this court cannot create an administrative protest process not now afforded, we hold that the process statutorily available can be utilized by the taxpayer on the first statutory occasion available after the reassessment has occurred, even if during the next year. Support for this conclusion is derived from Art. 15, §§ 10 and 11, Wyoming Constitution,[12] as sustained by the county board of equalization process unlimited by any defined year in § 39–2–302, and by the state board in § 39–1–304(a)(xiv).

### FORM OF THE PROTEST NOTICE

■ The district court found fault with the protest notice filed with the county board of equalization pursuant to § 39–2–302 in two particulars. The form

---

**11.** If we were to have adopted the position advanced by the State that the tax was illegal as differentiated from an improper assessment, then *Atlantic Richfield Company v. Board of County Commissioners,* supra, would apply, which teaches that no statute of limitation is presented. All the 1984 tax increases in the Fall reassessment for all Natrona County taxpayers might be subject to refund.

**12.** "The duties of the state board [of equalization] shall be as follows: * * * Said board shall also have power to equalize the valuation on all property in the several counties * * *." Article 15, § 10, Wyoming Constitution.

"All property, except as in this constitution otherwise provided, shall be uniformly assessed for taxation, and the legislature shall prescribe such regulations as shall secure a just valuation for taxation of all property, real and personal." Article 15, § 11, Wyoming Constitution.

was signed by an officer of the corporation rather than an attorney, and the form of attestation was rejected. Signing of notices, particularly when an oath or acknowledgment is required, is properly the responsibility of the entity officer and not the province of the attorney who might not have personal knowledge. *Apperson v. Kay*, Wyo., 546 P.2d 995 (1976); *Blyth & Fargo Co. v. Swensen Brothers*, 7 Wyo. 303, 51 P. 873 (1898). Cf. *Stricker v. Frauendienst*, Wyo., 669 P.2d 520 (1983). Additionally, we find the "acknowledged" form of execution to suffice for the tax assessment protest. *Bowers Welding and Hotshot, Inc. v. Bromley*, Wyo., 699 P.2d 299, 301 (1985). For sufficiency of the execution of the tax protest petition we do not differentiate "under oath" from "acknowledgment" before a notary public. With regard to sufficiency of the execution of the tax protest petition, we do not differentiate "under oath" from "acknowledgment" before a notary public unless objection is taken by the governmental agency in order to afford an opportunity for reexecution by the complaining taxpayer. Receipt and consideration of the written taxpayer complaint, without objection by the taxation authority, constitutes waiver of technical sufficiency questions about the method of execution.[13]

This case is remanded so that the state tax commission will be ordered to either adopt the November, 1985 hearing data to be applied to the year 1984, or to hold another hearing to consider an assessment for that year which is fair, equal, and uniform as related to comparable assessments, both for the taxpayer's property in other years and for other taxpayers similarly situated for the same year. This court only considers this case on its specific facts of a post-statutory schedule reassessment to assure a taxpayer right of hearing, and declines to consider the validity of reassessment in that protest and objection. Rights under the statutes and the Constitution are protected and preserved. By this conclusion, we avoid constitutional inquiry and afford a workable system until a different process is legislatively adopted.

Reversed and remanded for further proceedings in conformity herewith.

---

13. Few taxpayers, and perhaps not all lawyers, readily differentiate "verification" from "under oath" from "acknowledgment" from the generalized "sworn to" requirement. More modern administrative processes, as for example the United States Internal Revenue Code, simplify or eliminate this unnecessary confusion by statutory provisions which provide that a signature constitutes "execution under penalty of perjury."