PATHFINDER MINES
CORPORATION, Petitioner,

v.

STATE BOARD OF EQUALIZATION,
the Wyoming Department of Revenue
and Taxation, Ad Valorem Division,
Respondent.

No. 87–280.

Supreme Court of Wyoming.

Dec. 15, 1988.

John A. MacPherson and Catherine Mac-
Pherson of Johnson, MacPherson & Noeck-
er, Rawlins and Thomas W. Pennington of
Pathfinder Mines Corp., San Francisco,
Cal., for petitioner.

Joseph B. Meyer, Atty. Gen., Michael L.
Hubbard, Sr. Asst. Atty. Gen., and Robert
J. Walters, Asst. Atty. Gen., for respon-
dent.

Before CARDINE, C.J., THOMAS,
URBIGKIT and MACY, JJ., and
BROWN, J., Retired.*

URBIGKIT, Justice.

This appeal involves a contest to an extra
$712,329 assessed in 1986 as a severance
tax on uranium and presents for inquiry a
change in the system of valuation by the
Wyoming Department of Revenue and Tax-
ation as administratively approved in con-

* Retired June 30, 1988.

tested hearing before the Wyoming State Board of Equalization. To be discussed are countervailing factors of a valuation system for prior years which understated taxable value in contravention of constitutional and statutory requirements as engaged against the present challenge of improper administrative processes used to make the 1986 change.

In deciding this appeal which raises basic Wyoming constitutional and statutory criteria of fair, equal and uniform taxation as based on value, we affirm the decision of the Wyoming State Board of Equalization which upheld the department valuation application for the tax year 1986 and denied refund of protested payments.

Pathfinder Mines Corporation (Taxpayer), as petitioner and appellant, appealed to the district court by petition for review from the action of the Wyoming Department of Revenue and Taxation (Department) and confirmed by the Wyoming State Board of Equalization (Board). The petition for review was certified to this court pursuant to W.R.A.P. 12.09. The contested change in valuation, as a different process from prior years, resulted in a tax paid for 1986 of about 230% above admitted obligation or a total of 330% of amounts paid under prior valuation methodology.[1] Historically, for reasons not explainable in constitutional terms or valuation principles, the Department had used a pricing system called "Circular 5 Modified" (Circular 5) for

uranium ore. In the late 1960's, as the only purchaser for the uranium ore product, the United States developed that payment system based upon a $U_3O_8$ (yellowcake) value of $8 per pound. With discontinuance of the monopoly purchase system of the federal government, yellowcake price floated with world market reaching a high of about $42 and to fall in more recent times to a price of less than $18 per pound. The constancy of the Circular 5 system retained a continued value for taxation at the $8 per pound standard, no matter what the market value might have been.[2] Lacking any reliable argument that the continuation of the prior system was justified factually in application, the contentions presented by Taxpayer to avoid the increase for the 1986 tax year are then analyzed in conjunction with the processes by which the changed method was actually put into effect.

The first issue presented was strictly procedural in statutory interpretation. Using W.S. 39–6–301(a)(iv), Taxpayer contended that the pricing for severance tax in 1986 was statutorily limited to the same valuation system used for ad valorem taxes in 1985.

Secondly, Taxpayer contended that any change in the system, even if permitted first for severance taxes to be different from the ad valorem system for the prior year, was put into effect in 1986 without timely notice and was consequently invalid.

1. As presented, the controversy relates only to severance tax. However, the same valuation questions apply to the ad valorem tax as a valuation process which is also within the jurisdiction of the Department for assessment, although payments received for ad valorem tax generally are applied to local levels of government which, in this case, would be principally Carbon County and its school district.

2. It was not represented in briefing nor by direct response to question in oral argument, but Circular 5 *did not* have any general relevance to either present sales prices or market value. It was only a historical assumed taxation standard and it did not have any ratio relevance to taxation of oil and gas or other mineral production within the severance taxation system. See *Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization*, 749 P.2d 221 (Wyo.1987). A casual computation, which includes the histori-

cal higher production and high prices once existent in earlier times, demonstrates that the state lost tens of millions of dollars in lost tax revenues, including both ad valorem and severance, when the uranium industry was in its healthy period in Wyoming. The state is now called, with the industry in a catastrophic decline, to reverse the admonition of the historical axiom, "make hay while the sun shines." *Amoco Production Co. v. State*, 751 P.2d 379 (Wyo.1988). Circular 5 is biased in favor of reduced tax for higher priced and higher quality ore production. Taxpayer contends mathematically that with lower market price, the state system will totally eliminate any valuation of the ore for taxation assessment. At $15 pricing and ore grade of .2% (or $20 per pound and .10%) the two systems produce a very similar result. The divergence here resulted from the higher price utilized in actual sales price of $53.65 and an approximate .2% product content ore.

As a third contention, it was argued that the valuation system change required Wyoming Administrative Procedure Act (WAPA) rules and regulation adaptation, including compliance with advance notice and hearing provisions as was not done.

Fourth, as an issue of valuation itself, Taxpayer rejected the basic underlying value since that number was premised on a long term contract advantageous sales price as substantially higher than the general market spot price for the yellowcake product.

Finally, in the more generalized argument, Taxpayer challenged the integrity of the adopted system itself as a proper taxation valuation approach.

Superimposed in our consideration of this taxation issue is factual demonstration and required legal conclusion that the pre–1986 system was rationally unrelated to market value and did not comply with either statute nor constitution, *Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization,* 749 P.2d 221 (Wyo.1987); as then presenting the question of whether what the Department did was appropriate to rectify the recognized illegality of prior years. The objective in both statutory and constitutional perspectives of Wyoming taxation is to ascertain the value of the natural ore at mine (or wellhead) prior to other activities which increase the value including processing, beneficiation or transportation. *Appeal of Monolith Portland Midwest Co., Inc.,* 574 P.2d 757 (Wyo.1978); *Hillard v. Big Horn Coal Co.,* 549 P.2d 293 (Wyo. 1976); *C F & I Steel Corp. v. State Bd. of Equalization,* 492 P.2d 529 (Wyo.1972); *McDermott & Co. v. Hudson,* 370 P.2d 364 (Wyo.1962). The Circular 5 artificial value is directly comparable to variable ratios, which were the subject of exhaustive inquiry by this court in *Rocky Mountain Oil and Gas Ass'n,* 749 P.2d 221. Nor was the actual cost criteria met as dispositively required in *Appeal of Monolith Portland Midwest Co., Inc.,* 574 P.2d 757.

Historically in this tax development, on about April 8, 1986, Taxpayer received a letter dated April 7, 1986 (April 7 letter) from the Department advising of the discontinuance of the Circular 5 method to be replaced by a valuation computation based on quantities times price received and to be reduced for taxation purposes by a deduction of $35 per ton processing costs, haulage and other taxes. The change was promptly protested by appeal to the Board with the first quarter tax paid of $305,131, of which a calculated $194,111 was contended to be the increased amount derived from the system change.

On August 8, 1986 (August 8 letter), a second letter was received advising that the system for the second, third and fourth quarters would be slightly changed as similar, except that actual processing costs would be substituted for the arbitrary $35 figure with proviso added for a further credit of 15% as a return on investment. Another appeal was taken from the August 8 letter which related to the last three quarters, with protested tax for the year then aggregating $712,329.

ISSUES PRESENTED.

I. *Changed Method for Severance Tax From Prior Year—Ad Valorem, W.S. 39-6-301(a)(iv)—Illegality of Change From Controlling Ad Valorem Tax Standard.*

W.S. 39–6–301(a)(iv) provides:

"Value of the gross product" means the valuation of the gross product for the preceding calendar quarter of all mines and mining claims as calculated on the same basis as is prescribed by W.S. 39–2–202 for determination by the department of the value of the gross product for the preceding calendar year.

W.S. 39–2–202, which is incorporated by reference in the prior statute, further provides:

(a) Based upon the information received or procured pursuant to W.S. 39–2–201(b) or (c), the board shall annually value the gross product for the preceding calendar year, in appropriate unit measures of all mines and mining claims from which valuable deposits are produced, at the fair cash market value of the product at the mine or mining claim where produced, after the mining or production process is completed.

(b) The mining or production process is deemed completed when the mineral product is removed from the pit, shaft, mine or well, and prior to any benefication [beneficiation] or further processing is placed in storage prior to transportation to market, or in the case of natural gas, in the pipeline for transportation to market.

(c) If the product as defined in subsection (b) of this section is sold at the mine or mining claim, the fair cash market value shall be deemed to be the price established by bona fide arms-length sale.

(d) In the event the product as defined in subsection (b) of this section is not sold at the mine or mining claim by a bona fide armslength sale, or, except as hereafter provided, if the product of the mine is used without sale, the department shall determine the fair cash market value by application of recognized appraisal techniques. Natural gas which is vented or flared under the authority of the Wyoming oil and gas conservation commission and natural gas which is re-injected or consumed prior to sale for the purpose of maintaining, stimulating, treating, transporting or producing crude oil or natural gas on the same lease or unit from which it was produced has no value and is exempt from taxation.

■ Taxpayer contends by application of these statutes that the recognized and utilized technique to determine market value for ad valorem in 1985 controlled, and that the system consequently could not be changed for severance or production tax for 1986.

We dispose of the subject by recognition that the argument presumes validity of the system used for 1985, which is clearly undemonstrable. See *Natrona County School District No. 1 v. Ryan*, 764 P.2d 1019 (Wyo.1988). Consequently, the Department was not required to continue an invalid system which afforded no reasonable relationship to market value as illegal and contrary to the constitutional mandates of equal and uniform; Wyo. Const. art. 15, § 3, "in proportion to the value thereof";

Wyo. Const. art. 15, § 11 "shall be uniformly assessed for taxation * * * as shall secure a just valuation * * * *"; Wyo. Const. art. 15, § 19 "on the value of the gross product extracted"; and Wyo. Const. art. 1, § 28, "equal and uniform." *Rocky Mountain Oil and Gas Ass'n*, 749 P.2d 221; *State ex rel. Greenwood v. Pearson*, 46 Wyo. 307, 26 P.2d 641 (1933); *Bunten v. Rock Springs Grazing Ass'n*, 29 Wyo. 461, 215 P. 244 (1923).

The Board set forth its position on this point as a conclusion of law:

* * * Petitioner is not entitled to the relief requested due to the computation of gross products taxes on "Circular 5 Modified." The gross products tax and the severance taxes are separate taxes, which are controlled by separate statutory provisions. Simply because gross products taxes may have been valued improperly does not entitle the petitioner to claim the same improper treatment for severance taxes. W.S. § 39–2–202 does not mandate the use of "Circular 5 Modified."

Responsively to the argument, Taxpayer asserts that the "improper" determination was not demonstrated. We find that contention to lack persuasion. A system that has no real relevance to value cannot be considered as a proper methodology for taxation valuation and assessment determination, and there goes Circular 5. Consequently, we do not confine the state and its agencies to the use in 1986 of a system, although used in 1985, which was improper for either year. *Appeal of Monolith Portland Midwest Co., Inc.*, 574 P.2d 757; *Bunten*, 215 P. 244.

II. *Untimely Notice to Taxpayer of Valuation System Change—Delayed Notice.*

■ W.S. 39–6–304(b) provides:

On or before April 1 of each year the board shall furnish each known taxpayer under this article a basis for computing the value of his product as prescribed in W.S. 39–2–202 and 39–6–301. The department may revise a basis as necessary and shall furnish the revised basis to

each known taxpayer. A taxpayer shall not use less than the most recent basis furnished under this subsection in computing his quarterly payments.

Without question, compliance with the statute did not exist in noticing a change to the method since the first notice was provided by the April 7 letter and received on April 8, 1986. We are consequently faced with determining whether this defect requires 1986 retention of the invalid Circular 5 system within the predominating concerns for overall taxation process problems to be seen in recent Wyoming litigation. The Board argues that the dates were directory and not mandatory and that considering reconciliation criteria in computation and lack of prejudice in delayed notice for the Taxpayer, the substantive tax correction should not be rejected on this basis. Taxpayer contends with persuasion that the statute is clear on its face and should be mandatorily enforced. We will confine our conclusion to the facts in this case and will not resolve the issue on the discretionary-mandatory differentiation. The issue comprehends a constitutional and statutory obligation for public purpose taxation based on value and cannot be defined to a business decision type of differentiated system development. Consequently, this court will not require continuation of an invalidly low tax for another year when litigative prejudice to the Taxpayer is not shown by the one week delay in method change announcement.[3] *Weaver v. State Bd. of Equalization,* 511 P.2d 97 (Wyo.1973); *Baker v. Paxton,* 29 Wyo. 500, 215 P. 257 (1923). Cf. *Appeal of Paradise Valley Country Club,* 748 P.2d 298 (Wyo.1988).

III. *The Letter Announcement Approach Was Improper Where a Rules Adoption System Should Have Been Pursued to Redefine the Taxation Valuation System— Issue Rule Adaptation Required.*

In first analysis, Taxpayer is presented with an obvious anomaly considering that Circular 5, although applied for at least 20 years, was not adopted by rule itself. Essentially, the system appears to have first happened and then continued after initiation without consideration of changed circumstances engendered by the passing of time until 1986.[4] This court has not previously required that a valuation system adaptation and pricing mechanisms within the Department require promulgation by the regularized rule processes of the WAPA, W.S. 16–3–102(b), as long as statutory and constitutional rights to protest and contest are afforded to the taxpayer. *Appeal of Paradise Valley Country Club,* 748 P.2d 298; *Wyoming Min. Ass'n v. State,* 748 P.2d 718 (Wyo.1988). Cf. *Montana–Dakota Utilities Co. v. Wyo-*

**3.** The court could observe from exposure to the broad issues encountered in *Rocky Mountain Oil and Gas Ass'n,* 749 P.2d 221, that industry executives and legislators alike recognized well before 1986 that the Wyoming taxation system was operationally catastrophic in constitutional characteristics. Why the Circular 5 system was continued for uranium valuation not one but 20 years past time when it ceased to have a validity may be explainable in politics but not in tax law nor constitutional analysis.

**4.** On March 26, 1970, the Board adopted a "Minute Entry" which, as including other mineral products, provided:

"The Board unanimously agreed that the value of minerals other than oil, gas and uranium should be determined by the following formula:

Sales price of processed product f.o.b. contract or commercial carrier, minus all costs to point of determined sales price equals money profit. All costs to point of determined sales price less royalty divided into money profit equals percent of profit. Mining cost less royalty multiplied by percent of profit equals mine profit. Cost of mining plus royalty plus mine profit equals value of mineral as mined. If a sales price can only be obtained at a point after commercial transportation the price used will be that price less the commercial transportation charge.

Uranium shall be valued by the Circular 5 price on the average yearly grade of each mine, reduced or increased by the percentage of the average yearly sale price of $U_3O_8$ per lb. The producer's transportation cost shall be deducted on the basis of commercial transportation paid or actual cost plus a reasonable profit.

Oil, as in the past, will be valued at the contract or posted field price less transportation, if any, to the nearest pipeline tariff point."

*Hillard,* 549 P.2d at 296.

*ming Public Service Com'n,* 746 P.2d 1272 (Wyo.1987) (rate making process).

If we determine that every valuation decision of the Department or Board requires a rule adaptation, then we individually involve the Governor with each taxing incident since the Governor must approve all rules and the requirement will cause him to become a direct administrative participant in the tax collection process. See W.S. 16–3–103(d). The adaptation criteria of W.S. 39–1–304(c) relates to action of the Board and not the Department which abandoned Circular 5 to attempt to achieve the statutorily required fair market cash value in W.S. 39–2–202(c) criteria as adopted in accord with the general rules promulgated as Rules and Regulations of the Wyoming Tax Commission, Department of Revenue and Taxation Ad Valorem and Severance Taxes on Mineral Production, ch. XXI, § 10. We concur with the Board in contention that the basic decision letters as issued by the Department do not constitute rules and need not be adopted pursuant to the WAPA. Consequently, this was not a rule required adaptation by the Board as addressed by 1985 Wyo.Sess.Laws ch. 103, § 1 as now found in W.S. 39–1–304(c). For these reasons, we also reject this argument to require tax payment reversal.

Furthermore, the "Minute Entry" taxation criteria, if ever since 1970 in compliance with the constitutional equality mandates, *Rocky Mountain Oil and Gas Ass'n,* 749 P.2d 221, surely did not continue that compliance to 1986 when then also representing a departure from W.S. 39–2–202. Appropriately, albeit belated, attempted Department correction effort should not be denied because of the slightly delayed notice. Otherwise, this court would require the state to continue the unconstitutional application resulting in loss of state revenue which would defeat the intrinsic responsibility of the Department to the state and its citizens. The action consequently taken by the Department only served to delete the uranium industry differentiated standard from the general guidelines in order to achieve a required equality of taxation method with other comparable mineral products. It is perceived that in constitutional fact, the Board did not adopt a new rule nor did it change a formula that was not already in existence by removal of an exception from the general standard for a result which was not only timely and lawful but, in fact, constitutionally and statutorily mandated.

### IV. *General Market Value versus Contract Sales Price—Valuation at Price Received.*

■ Taxpayer contends that in itself, the adopted system was faulty since the basic price used for computation was what Taxpayer received through an extremely favorable long term sales contract as a price measurably higher than the general market spot price for the product. We conclude in response that use within a computative system for valuation of what the Taxpayer gets is not arbitrary or capricious as now to be rejected on litigative attack. Cf. *C F & I Steel Corp.,* 492 P.2d 529.

### V. *The Development Process and Approval by the Board Was Characterized by Conduct Which Was Arbitrary and Capricious and an Abuse of Discretion—Validity of Basic Decision as Administrative Action.*

■ Taxpayer finally contends that the supervisory decision of the Board was arbitrary, capricious and not in accord with law by its generalized attack on the increased tax and its appeal approval after the formal Board hearing. In applying our usual standard for examination of the record, we find that this attack also fails in persuasion. *Burlington Northern R. Co. v. Public Service Com'n of Wyoming,* 698 P.2d 1135 (Wyo.1985). Substantial evidence is found which sustains the findings and the conclusions of the Board. As we said in *Cody Gas Co. v. Public Service Com'n of Wyoming,* 748 P.2d 1144, 1147 (Wyo.1988), statutory designation of an administrative agency function encompasses a reasonable delegation of process determination required or adopted for performance and particularly so since the Board has a constitutional responsibility within the taxation in-

strumentalities of the state by Wyo. Const. art. 15, § 10.[5]

Any constraints on methods available to the agency to exercise designated responsibilities should be emplaced by specific statutory restrictions if constitutional interests are otherwise protected.

*Cody Gas Co.*, 748 P.2d at 1148.

The methodology developed by the Department for valuation as now applied belatedly to uranium has received prior approval of this court in the course of litigative examinations. *Hillard*, 549 P.2d 293; *C F & I Steel Corp.*, 492 P.2d 529. Hypothetical costs which are intrinsic to Circular 5 are not acceptable. *Appeal of Monolith Portland Midwest Co., Inc.*, 574 P.2d at 761. Trial hearing computative analysis demonstrates reliability in the actual processing cost of approximately $27.04 as compared to the result derived total through Circular 5 of $89.53 per ton or 330% more. That previously used approach does not now come unannounced to this court, since previously visited in the contract dispute involving *Cheyenne Min. and Uranium Co. v. Federal Resources Corp.*, 694 P.2d 65, 73 (Wyo.1985) where, even for that purpose, this court "conclude[d] that the gross-proceeds figures obtained from Circular 5, as modified, were not sufficiently reliable to permit the trial court to award * * * [a] proper share of profits," as it there ignored the effect of technological advance in both milling and mining. Here, it also ignores economic changes from price increase.

Intrinsic to government is not only the adequacy but also the fairness of revenue collection for its support. Within the context of our prior litigation for pricing purposes to determine tax as enumerated in *C F & I Steel Corp.* and *Hillard,* we would confirm exercise of discretion by this administrative agency as factually justified and not arbitrary nor capricious. *Teton Valley Ranch v. State Bd. of Equaliza-*

*tion,* 735 P.2d 107 (Wyo.1987); *Bunten,* 215 P. 244.

AFFIRMED.

---

**5.** The duties of the board shall be to equalize the valuation on all property in the several counties and such other duties as may be prescribed by law.